[No. 36081.    Department Two.    April 25, 1963.]

Most Worshipful Prince Hall Grand Lodge of Washington and Its Jurisdiction, F. & A. M. *et al.*, *Respondents*, v. The Most Worshipful Universal Grand Lodge, A. F. & A. M. of Washington *et al.*, *Appellants.*

Most Worshipful Prince Hall Grand Lodge of Washington and Its Jurisdiction, F. & A. M. *et al.*, *Respondents*, v. Most Worshipful John A. Bell Grand Lodge of Washington, A. F. & A. M. *et al.*, *Appellants.**

* Reported in 381 P. (2d) 130.

*R. M. Burgunder* (*W. F. Lockett*, of counsel), and *Deane W. Parker*, for appellants.

*Ben A. Maslan* (of *Maslan, Maslan & Hanan* and *Amos T. Hall*, of counsel), for respondents.

DONWORTH, J.—Respondents, Most Worshipful Prince Hall Grand Lodge of Washington and its Jurisdiction, F. & A. M. *et al.* (hereafter referred to as Prince Hall Grand Lodge), brought separate actions to enjoin the operation of

the Most Worshipful Universal Grand Lodge, A. F. & A. M. of Washington, *et al.* (hereafter referred to as Universal Grand Lodge), and of the Most Worshipful John A. Bell Grand Lodge of Washington, A. F. & A. M. *et al.* (hereafter referred to as John A. Bell Grand Lodge). Both appellants and respondents hold themselves out to the public as colored Masonic lodges. These actions were consolidated in the trial court and have also been consolidated for purposes of this appeal. Judgment was entered adversely to the defendants in each case, and they have each appealed therefrom.

The record in this case is voluminous. The trial consumed 8 days. Seventy exhibits were admitted in evidence (6 more were offered and refused). Several exhibits consist of books written by members of the Masonic order on the subject of Negro Masonry in the United States and printed copies of the proceedings of various grand lodge meetings relating to that subject. The testimony of the witnesses, most of which related to the Masonic antecedents of the respective parties, is transcribed in 567 pages of the statement of facts.

At the close of the evidence the trial court rendered an oral opinion (which respondents, for the convenience of this court, have included in an appendix to their brief—23 pages). In this opinion, the court exhaustively reviewed the evidence and also the many cases relied on by the respective parties.

Thereafter, the trial court entered 26 findings of fact and 8 conclusions of law in each of the consolidated cases (which are virtually identical). After hearing and denying appellants' post-trial motions, the court entered its judgment and decree in each case (effective 30 days thereafter) permanently enjoining the respective appellants from establishing or conducting lodges of Masons or auxiliaries thereof within this state and from using certain specified words or initials indicative of the Masonic order.[1]

---

[1] The trial court's decree enjoined appellants from establishing or conducting lodges of Masons or auxiliaries thereof within the state of Washington and from using the words "Ancient Free and Accepted

Appellants, in their joint brief in this court, rely for reversal on 20 assignments of error. Of these, 13 relate to certain findings of fact and certain conclusions of law based thereon.

■ Appellants argue in support of their first 6 assignments of error that the comparative analysis of the origin and ancestry of the 3 lodges involved in this case was not a proper or necessary issue to be decided by the trial court, citing *Most Worshipful Hiram of Tyre Grand Lodge of Ancient Free & Accepted Masons (Colored) of State of California v. Most Worshipful Sons of Light Grand Lodge Ancient Free & Accepted Masons, Jurisdiction of California,* 94 Cal. App. (2d) 25, 210 P. (2d) 34 (1949). In that case, both the plaintiff and defendant were found by the trial court to be clandestine Masonic lodges. Origin and ancestry were not in issue in the appellate court, which simply refused to grant one clandestine lodge the exclusive right to operate a Masonic grand lodge. It did enjoin the defendant from representing itself as the plaintiff's organization and from other fraudulent acts.

■ Referring to the same assignments, appellants contend that respondents failed to carry the burden of proving that their origin was legitimate according to Masonic law and that appellants' origin was not. The evidence upon this issue was in conflict, but there was substantial evidence to support the trial court's findings Nos. 4, 9, 12, 15, and 20. This court cannot retry issues of fact where there is substantial evidence in the case to support the trial court's findings. *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn. (2d) 570, 343 P. (2d) 183 (1959).

Respondents trace their Masonic ancestry from African Lodge No. 459, established in Massachusetts in 1784. The trial court found that the source of all legitimate Free-

Masons," "Free and Accepted Masons," "Masonic Lodge," "Masons," "Freemasons," "Scottish Rite Masons," of the initials "A. F. & A. M.," or "F. & A. M.," or any colorable imitations thereof in any manner whatsoever; and from holding themselves out as Masons or Masonic lodges and from using or employing rituals, ceremonies, names, insignia, emblems, badges, symbols, signs, paraphernalia, or designations of an organization of Masons.

masonry among colored men in the United States is African Lodge No. 459. The origin of this ancestral lodge and Negro Masonry in the United States was summarized in the recent case of *International Free & Accepted Modern Masons v. Most Worshipful Prince Hall Grand Lodge, Free & Accepted Masons of Kentucky*, 318 S. W. (2d) 46 (Ky. 1958), 76 A.L.R. (2d) 1386, at pages 48 and 49:

"As is well known, the order of Free and Accepted Masons is an ancient and honorable secret fraternity. Its origin is lost in antiquity. The Masonic legend is that it began with the craftsmen at the building of King Solomon's Temple. Documentary rolls and other records, still preserved, of the Fourteenth Century and later centuries prove the establishment and continuity of Masonic lodges at least from such times down to the establishment of the premier Grand Lodge of England in 1717. From that time previously separate lodges became subordinate affiliates of Grand Lodges. All regular grand and subordinate lodges throughout America, directly or indirectly, have sprung from this mother grand lodge. [Citing Encyclopedia Britannica, 'Freemasonry.']

"A brief history of Freemasonry among colored people in America, as shown in this record and by historical references and in several judicial opinions, seems appropriate.

"Prince Hall, a free Negro, a native of Barbados, West Indies, became a worthy resident of Massachusetts. He knocked and the door of Masonry was opened to him by a British Military Lodge in Boston in the year 1775. He was the first man of African descent to become a Master Mason in America. Hall became a Revolutionary War patriot, receiving recognition from General Washington and other leaders. After the war, Hall and his brethren were refused a charter by the Provincial Grand Lodge of Massachusetts because of their race. Upon their application, the Grand Lodge of England, 'under authority of His Royal Highness, Frederick, Duke of Cumberland, Grand Master of the Most Ancient and Honorable Society of Free and Accepted Ancient Masons,' granted them a charter on September 29, 1784, under the name of African Lodge No. 459, to be opened in Boston. That was done in May, 1787. Later, African Lodge No. 459 declared itself to be a Grand Lodge with jurisdiction throughout the United States, and the Grand Lodge of England granted a patent or provincial powers to the African Lodge as such. After the death of

Prince Hall in 1807, the colored Masonic grand lodges changed their names in his honor and many succeeding lodges have adopted it.

"As time went along, Prince Hall Grand and subordinate lodges of colored Masons were chartered and organized throughout the United States, Canada and other countries, all of them springing from African Lodge No. 459. These historical facts are more or less confirmed by several judicial opinions. See, *Prince Hall Grand Lodge of F. & A. Masons v. Most Worshipful King Solomon Grand Lodge, A. F. & M. (Colored)* 62 N. M. 255, 308 P. (2d) 581; *Most Worshipful Widows' Sons Grand Lodge of Ancient F. & A. Colored Masons of Pennsylvania v. Most Worshipful Prince Hall Grand Lodge of F. & A. Masons of Pennsylvania,* 160 Pa. Super. 595, 52 A. 2d 333; *Most Worshipful Prince Hall Grand Lodge, Free & Accepted Masons, of Georgia v. Supreme Grand Lodge, Modern Free & Accepted Colored Masons of the World, D. C.,* 105 F. Supp. 315."

The evidence presented by respondent is in accord with the historical account related above.

The following is a summary of the findings of the trial court:

(1) Prior to the date of its incorporation, respondent Prince Hall Grand Lodge existed as an unincorporated association in the state of Washington from the year 1903, but traces its Masonic background in this state to Prince Hall Ancestry Lodge organized in 1889 at Roslyn, Washington. Prince Hall Grand Lodge was first incorporated in the state of Washington in 1906 under the name of "Grand Lodge of Free and Accepted Masons—African—of Washington." In 1907, the name was changed to "Most Worshipful United Grand Lodge of Washington and Jurisdiction." In 1944, the name was changed to "Most Worshipful Prince Hall Grand Lodge of Washington and its Jurisdiction, F. & A. M."

(2) Appellant John A. Bell Grand Lodge and appellant Universal Grand Lodge organized their grand lodges in the state of Washington in 1945 and 1947, respectively. The former claimed to trace its Masonic ancestry to a lodge that was established by a former Prince Hall member who

was expelled by the Grand Lodge of Michigan in 1898, and the latter claimed ancestry to a white Grand Lodge of Roumania.

(3) The trial court found that respondent Prince Hall Grand Lodge is a legitimate Masonic lodge tracing its Masonic ancestry back to the original colored Masonic lodge in America, African Lodge, No. 459, and that appellants have no legitimate Masonic ancestry.

(4) Respondent Prince Hall Grand Lodge has 12 subordinate or Blue Lodges in this state with almost 800 members and with a corresponding membership in Eastern Star Chapters, Scottish Rite Consistory and Shrine groups. Respondents have about $100,000 invested in buildings and properties in the state of Washington.

(5) Appellants have, since their organization, falsely represented themselves as legitimate Masonic organizations and have sought and gained membership among colored men and women of good moral character who might otherwise have sought affiliation with respondents.

(6) The rituals, ceremonies, distinguishing names, words, insignia, symbols, emblems, badges, signs and paraphernalia used by appellants are identical, or so nearly identical, with those used by respondents as to confuse the identities of appellant organizations with those of respondents, and are calculated to confuse, mislead and deceive, and, in fact, have confused, misled, and deceived the public to the detriment and injury of respondents and of persons who may desire to become members of a legitimate lodge of Free and Accepted Masons or a legitimate auxiliary or associate group thereof.

The findings of fact as summarized above and in all other related particulars material to the trial court's conclusions of law are supported by substantial evidence.

This court has on many occasions affirmed decrees of trial courts which have enjoined the use of identical trade names or trade names so similar as to create confusion in the minds of the public. The rules governing unfair competition in the use of trade names were set forth in *Seattle Street R. & Municipal Employees Relief Ass'n v. Amalga-*

*mated Ass'n of Street, Elec. R. & Motor Coach Employees of America*, 3 Wn. (2d) 520, 101 P. (2d) 338 (1940), and have been repeated in *Foss v. Culbertson*, 17 Wn. (2d) 610, 624, 136 P. (2d) 711 (1943), and *Holmes v. Border Brokerage Co.*, 51 Wn. (2d) 746, 750, 321 P. (2d) 898 (1958).

It is unnecessary to again enumerate the 8 rules set forth in the above-cited cases. We are of the opinion that an established fraternal organization is entitled to relief when its name or one so similar as to be deceiving is adopted by another organization and used in a manner which is confusing and deceiving to the public and is detrimental to the organization already using the name.

The parties to this suit are not engaged in commercial businesses. However, *Seattle Street R. & Municipal Employees Relief Ass'n v. Amalgamated Ass'n of Street, Elec. R. & Motor Coach Employees of America, supra,* involved two competing relief associations engaged in charitable activities. We said in that case, at page 534:

"While the cases hereinabove cited dealt with commercial businesses and, for the most part, with tangible things sold by them, the principle involved is no less applicable to transactions such as are involved in this case. [Each of the parties was sponsoring a dance and selling tickets for fund-raising purposes.] The underlying concept is that of unfair competition in matters in which the public generally may be deceived or misled."

In the recent case of *International Free & Accepted Modern Masons v. Most Worshipful Prince Hall Grand Lodge, Free & Accepted Masons of Kentucky, supra,* the Kentucky Prince Hall Grand Lodge sought and obtained an injunction against a competing lodge enjoining it from representing itself as a Masonic lodge and using or employing rituals, ceremonies, *etc.*, of an organization of Masons. In the course of its opinion, the Supreme Court of Kentucky said:

" . . . The cardinal and characteristic words in the names of both of these parties are 'Free and Accepted Masons,' the foremost descriptive word being 'Masons.' The term and what it signifies is the most valuable asset of the Prince Hall Lodge, which it has sought to protect. . . ."

In affirming the granting of an injunction obtained by a Prince Hall Grand Lodge, in *Prince Hall Grand Lodge of Free & Accepted Masons v. Most Worshipful King Solomon Grand Lodge, A. F. & A. M. (Colored)*, 62 N. M. 255, 308 P. (2d) 581 (1957), the court said:

"We think appellant's use of the word 'Mason' or the terms 'Free and Accepted Masons' or 'A. F. & A. M.' or 'F. & A. M.', renders the name of the Grand Lodges so strikingly similar, as to cause confusion, tends to deceive the public, and induces persons to join one institution when actually they intended to join the other. This is verified from what is later said. The quoted words and terms are distinctive features of appellee; indeed, they are its most valuable assets. Consequently, appellee should be protected from any invasion of the right of exclusive use of them, also in the exclusive use of its insignia, symbols, emblems, etc., commonly used by it in the practice of Masonry. . . ."

Among the cases cited by the New Mexico court in support of its holding are these Prince Hall cases: *Supreme Grand Lodge, Modern Free & Accepted Colored Masons of World v. Most Worshipful Prince Hall Grand Lodge, Free & Accepted Masons, Jurisdiction of Georgia*, 209 F. (2d) 156, cert. den. 347 U. S. 953, 98 L. Ed. 1099, 74 S. Ct. 679 (1954); *Most Worshipful Prince Hall Grand Lodge, Free & Accepted Masons of Colorado & Jurisdiction v. Most Worshipful Hiram Grand Lodge, Free & Accepted Ancient York Masons of Colorado & Jurisdiction, National Compact Prince Hall Origin*, 85 Colo. 17, 273 Pac. 648 (1928).[2]

Appellants cite the following cases where the courts have been asked, and have refused, to enjoin a lodge from holding itself out as a Masonic lodge. The first case was *Most Worshipful Hiram of Tyre Grand Lodge of Ancient Free & Accepted Masons (Colored) of State of California v. Most*

---

[2] *Prince Hall Grand Lodge F. & A. M. of New York v. Supreme Council*, 32 Misc. (2d) 390, 227 N.Y.S. (2d) 841 (1962), is a recent trial court decision in which an injunction sought by a Prince Hall lodge to enjoin a fraternal organization from holding itself out and operating as "Masons" was granted. To the same effect as the above reported New York case is a memorandum decision dated September 14, 1960, from the Connecticut Court of Common Pleas which was filed with this court by respondent.

*Worshipful Sons of Light Grand Lodge Ancient Free & Accepted Masons, Jurisdiction of California*, 94 Cal. App. (2d) 25, 210 P. (2d) 34 (1949). The California District Court of Appeals (1st Dist.) did refuse to enjoin the operation of an organization from conducting a Masonic grand lodge. However, it does not appear that either party claimed any legitimate Masonic ancestry. The court pointed out that both parties were "clandestine" Masonic lodges. It, therefore, refused to grant one such lodge the exclusive right to exist over the other.

The second case is *Free & Accepted Masons of the State of Texas v. Ancient Free & Accepted Masons, Colored*, 179 S. W. 265 (Tex. Civ. App. 1915). Here both parties claimed to be the only legitimate Negro Masonic lodge in Texas. No determination was made on this issue. The court found that the defendant did not adopt its name with the intent of leading people to believe it was the plaintiff. The court said that it could be held that the defendant adopted its name under circumstances which did not induce a belief that it was the same order as the plaintiff. The court concluded that an injunction was not warranted.

*Taylor v. Austin*, 221 S. W. (2d) 933 (Tex. Civ. App. 1949), is factually similar to the Texas case just discussed and was disposed of by denial of an injunction on its authority.

A leading case concerning unfair competition among fraternal organizations is *Grand Lodge of Improved, Benevolent & Protective Order of Elks of the World v. Grand Lodge, Improved, Benevolent & Protective Order of Elks of the World, Inc.*, 50 F. (2d) 860 (1931). The case involved two colored fraternal organizations. A schism had developed within the plaintiff organization which resulted in the secession of certain representatives and the establishment of a rival order under practically the same name. The court, in an opinion written by the late Judge Parker, speaking for the Court of Appeals (4th Cir.), stated:

"Coming to the merits, it is well established that a benevolent, fraternal, or social organization will be protected in the use of its name by injunction restraining another organ-

ization from using the same or another name so similar as to be misleading."

After citing numerous cases and discussing certain treatises, the court went on to say, at page 864:

"In the case at bar, complainant for more than a quarter of a century had enjoyed the use of its name and had built up thereunder a large fraternal order among the colored people of the United States. Its fraternal, charitable, and educational activities had commended it to the public, and had given membership therein a value to the people from whom it recruited its membership. It was entitled to enjoy the fruits of the organization which it had built up, unhampered by the efforts of others to appropriate to themselves its corporate name with the advantages thereto attaching. If the Virginia members were dissatisfied, they, of course, had a right to withdraw and organize a new order; but they had no right, if they did so, to adopt the name of the original order or to hold themselves out as a branch of that order. To do so constitutes a fraud upon the original order and upon the public, and, if allowed, would result in enabling the rival organization to appropriate to itself the advantages which the original order had built up through years of effort. A more glaring example of unfair competition could not well be imagined."

We think respondents are supported by ample authority in seeking an injunction under the common law of unfair competition.[3]

The trial court also found appellants to be acting in violation of RCW 9.37.050 (Laws of 1911, chapter 46, § 1), relating to the fraudulent use of the name of a secret society. The statute applies to organizations using "the name or title of any secret fraternal association, society, order or organization which has had a grand lodge in this state for five years, . . . " It was established that there was a Masonic grand lodge (the distinguishing name of their fraternal order being "Masons") in existence within this state for over 5 years prior to the establishment of appellants' organizations, the latter using the name "Masons" without the authority of the established grand lodge.

---

[3]For a comprehensive annotation on the principal problems involved in the instant case, see 76 A.L.R. (2d) 1399.

■ Appellants assert that if they have violated this statute, so have respondents, since there was a white grand lodge of Masons within the state prior to the organization of respondents' grand lodge. The answer to this is that the statute was enacted in 1911 *after* respondents organized their grand lodge within the state of Washington.

Respondents' grand lodge was formed as an unincorporated association in 1903 and was incorporated in 1906. Therefore, respondents' grand lodge having been organized for the 5-year period preceding the enactment of the statute was obviously one of the organizations designed to be protected thereby.

Unless there is merit to the affirmative defenses raised by appellants, the trial court properly granted the injunction.

■ Appellants assert that respondents were guilty of laches and thus were estopped from maintaining these actions. It is asserted that respondents knew of the existence and activities of appellants' grand lodges in 1948, but did not bring these actions until 1959. As this court has previously stated:

" . . . To constitute laches there must not only be a delay in the assertion of a claim but also some change of condition must have occurred which would make it inequitable to enforce it. . . . " *Waldrip v. Olympia Oyster Co.,* 40 Wn. (2d) 469, 477, 244 P. (2d) 273 (1952).

The doctrine of laches is based upon the principles of equitable estoppel. *Gooden v. Hunter,* 56 Wn. (2d) 617, 355 P. (2d) 20 (1960); *Luellen v. Aberdeen,* 20 Wn. (2d) 594, 148 P. (2d) 849 (1944).

■ In the instant case, respondents did not acquiesce in the operation of appellants' lodges, but carried on an organized campaign to inform the public that Prince Hall Masons were the only legitimate Masonic organization composed of colored persons. The campaign included large newspaper advertisements that had wide circulation among the colored population. This program resulted in many of appellants' members leaving their lodges and even in the dissolution of one of their subordinate lodges. However,

appellants' grand lodges refused to disband, and legal proceedings were finally brought.

The trial court, in its oral opinion, referred to appellants' action as "the kind of action that a person might very well say would be better calculated than a lawsuit to accomplish the desired results." We agree with the trial court that starting a lawsuit is not the only way of manifesting dissent or opposition to claimed unfair competition. Under the circumstances of this case, the defense of laches has not been established.

Nor do we find any merit in appellants' claim that the actions were barred by the 3-year statute of limitation found in RCW 4.16.080, subdivision 4, which provides:

"An action for relief upon the ground of fraud, the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud."

■ This court has been called upon to apply this statute many times, and we have consistently held that this subdivision embraces only

". . . suits by parties to contracts who are asking to be relieved from contracts that they were fraudulently induced to make, as where a deed has been fraudulently obtained, and suits of that character where fraud is the substantive cause of the action. . . ." *Wagner v. Law*, 3 Wash. 500, 517, 28 Pac. 1109, 29 Pac. 927 (1892).

The foregoing statement has been quoted with approval in *Morgan v. Morgan*, 10 Wash. 99, 107, 38 Pac. 1054 (1894); *Cornell v. Edsen*, 78 Wash. 662, 663, 139 Pac. 602 (1914); *Henriod v. Henriod*, 198 Wash. 519, 526, 89 P. (2d) 222 (1939).

In *Constable v. Duke*, 144 Wash. 263, 267, 257 Pac. 637 (1927), we also stated:

"The contentions made on the second of the subdivisions quoted, we think, are also concluded by our former cases. We have held that this provision of the statute is applicable only in those instances where fraud is practiced directly upon the complaining party, and is the substantive cause of the action—instances where the complaining party has been induced to assume some obligation or liability or suffer

some loss which, but for the fraud, he would not have assumed or suffered—and is without application where the fraud alleged is only indirectly involved and does not of itself form the basic ground of the cause of action. *Hutchinson Realty Co. v. Hutchinson*, 136 Wash. 184, 239 Pac. 388, and cases therein collected."

The basis of this suit is unfair competition. The above quoted provision of RCW 4.16.080 (relating to the limitation of fraud actions) is not applicable. Furthermore, these actions are to enjoin further wrongful conduct, and damages for past injuries are not sought by respondents.

&#9646;&#9646; Appellants also assert as a defense that relief should be denied respondents because they do not come into court with "clean hands." The basis for this contention is that, because of the Masonic doctrine of "exclusive territorial jurisdiction," respondents themselves have violated Masonic law because the white grand lodge in the state of Washington was organized and existed in this state for many years prior to respondents' establishing their grand lodge. It is obvious that the courts are not bound by Masonic law. Nor does it appear that the doctrine which appellants advocate has prevented the operation of both Negro and white grand lodges within the same state. The following quotation from *Ancient Egyptian Arabic Order of Nobles of Mystic Shrine v. Michaux*, 279 U. S. 737, 738, 73 L. Ed. 931, 49 S. Ct. 485 (1929), is pertinent:

"From early times there have been two distinct masonic fraternities in the United States, one confined to white men and the other to negroes. Each has had its local lodges, grand lodges and supreme lodge, and also several component bodies, including Knights Templar and Scottish Rite consistories. Both have existed in the same territory and have had similar names, rituals and emblems, and yet have been independent and without any interrelation. The white fraternity's existence in this country reaches back to early colonial times. The negro fraternity was organized in Boston in 1784 and afterwards was extended to other sections."

We find no merit in appellants' argument that the prior existence of the white grand lodge in Washington prevents respondents from obtaining relief from unfair competition

by appellants. As pointed out by the trial court in its oral decision, the white grand lodge is not a party to this litigation and its rights are not before us. We note, however, that it and respondents' grand lodge have coexisted in this state for over half a century.

■ Error is assigned to the admission of books on Masonic history into evidence on the ground that they were hearsay. These books were introduced to show the history and legitimacy of colored Masonry and the Prince Hall lodges in this country. Foundation was laid for the admission of the historical works by qualifying their authors. The admission into evidence of treatises on ancient matters to which living witnesses are unlikely to be obtained is regarded as an exception to the hearsay rule. 5 Wigmore on Evidence § 1597; 20 Am. Jur., Evidence § 467. That historians may disagree goes only to the weight of the evidence. In this instance the history is buttressed by judicial opinions previously referred to concerning origin and ancestry of Prince Hall lodges.

There were many books on Masonic history introduced by both parties and admitted into evidence. However, it is contended that the trial court erred in refusing to admit into evidence exhibit No. 46, a history book offered by appellants. The record shows that this book was a supplement to a treatise on Masonic history written by a person other than the author of the original treatise. Appellants did not attempt to qualify this person as an expert nor did they show any other basis to justify the court in ruling that his work should be considered an authoritative history. Therefore, the trial court did not abuse its discretion by refusing to admit this volume into evidence.

■ Appellants' assignment of error No. 20 is in regard to the trial court's refusal to retax costs. The costs involved were taxed to appellant Universal Grand Lodge and were incurred in the taking of a deposition. It is contended that neither RCW 4.84.090 nor the rules of court authorize taxing, as costs, the expenses incurred in taking the deposition of a party or witness "for the purpose of preparing for the trial of the pending action, nor in ascer-

taining his rights for his own benefit." Such was our holding in *Platts v. Arney*, 46 Wn. (2d) 122, 278 P. (2d) 657 (1955), followed in *Arnesen v. Rowe*, 46 Wn. (2d) 718, 284 P. (2d) 329 (1955). The deposition in question was that of J. T. Washington, a defendant in the action. The deponent died prior to the trial. Portions of his deposition were offered into evidence by both respondents and appellants. It is urged that the taxability of expenses of a deposition depends on the purpose for which it was taken and not the eventual use made of it at the trial. Assuming this is true, it does not help appellants. Rule of Pleading, Practice and Procedure 26 (d) (2) reads, in part, as follows:

"(2) The deposition of a party . . . may be used by an adverse party for any purpose."

Since the deposition was, in fact, introduced into evidence, we shall not presume that it was not taken for that purpose. Therefore, there was no error in taxing this item.

It is further contended by appellants, in regard to the matter of costs, that, with respect to another deposition and two other items,[4] the costs should have been apportioned between appellant Universal Grand Lodge and appellant John A. Bell Grand Lodge rather than entering these costs against each separately. We believe the objection was cured by the trial court's ruling that respondents could recover payment for these items only once and could not collect costs from both appellants for the same items. *Van Nostern v. Richey & Gilbert Co.*, 2 Wn. (2d) 663, 99 P. (2d) 608 (1940), is cited by appellants for the proposition that the costs should be apportioned. In that case two defendants in a consolidated action appealed. The judgment against one of them was reversed and as to the other defendant it was affirmed. The defendant who prevailed on appeal was allowed to recover from the plaintiffs one half of its appellate costs. We do not think that it follows that trial costs should be apportioned among defendants in a

---

[4]The items are listed as: King County Auditor—Certified Copies, $4.50, and Court of Common Pleas, New Haven, Conn., Certified Copies, $17.50.

consolidated action when none of the defendants is successful.

As pointed out in *Ancient Egyptian Order of Nobles of Mystic Shrine v. Michaux, supra,* from colonial times there have been two Masonic fraternities in the United States—one white and the other Negro. The record indicates that lodges of "Prince Hall" origin have a valid claim to being members of the ancient and honorable order known as Masons. A photostatic copy of the original charter granted to the lodge organized by Prince Hall in 1784 was appended to the brief of respondent.[5]

That a group of persons seeks to form an organization devoted to charitable and fraternal objectives is commendable, but they cannot adopt the name of an already established order which has gained a highly esteemed reputation in the minds of the public. This court stated, in *State ex rel. LaFollette v. Hinkle,* 131 Wash. 86, 93, 229 Pac. 317 (1924):

" . . . Nothing so exclusively belongs to a man or is so personal and valuable to him as his name. His reputation and the character he has built up are inseparably connected with it. Others can have no right to use it without his express consent, and he has a right to go into any court at any time to enjoin or prohibit any unauthorized use of it. . . ."

While the *LaFollette* case involved an individual and is not authority for enjoining the acts of appellants in this case, it does show the value which this court has placed upon the right to the exclusive use of an established name.

There is no doubt that the persons joining appellants' lodges thought they were joining a legitimate Masonic lodge and that this was a principal reason for seeking membership. This is amply borne out by the fact that many of appellants' members resigned from their lodges after respondents began their campaign to inform the public

---

[5]In *Prince Hall Grand Lodge F. & A. M. of New York v. Supreme Council, supra,* note 2, it is stated that George E. Bushnell, former Chief Justice of the Supreme Court of Michigan, appeared as a witness and testified that Prince Hall Lodge has the only existing charter of any lodge in America originally granted by the Grand Lodge of England.

that their organization was the only legitimate Negro Masonic grand lodge in the state of Washington.

For the reasons stated in this opinion, the two decrees appealed from must be affirmed. It is so ordered.

OTT, C. J., FINLEY, HUNTER, and HAMILTON, JJ., concur.

---

June 12, 1963. Petition for rehearing denied.

\* Reported in 380 P. (2d) 863.