[No. 39189.    Department One.    July 11, 1968.]

Dix Steel Company, *Appellant*, v. Miles Construction, Inc. *et al., Respondents.*[*]

*Thomas Malott* and *Robert A. Southwell*, for appellant.

*George M. Hartung, Jr.* (of *LeSourd & Patten*), for respondents.

Hale, J.—Dix Steel Company had a contract with Miles Construction Company to erect some metal buildings at Wanapum Dam.[1] After the buildings were up, Miles Construction claimed that, because of Dix Steel's breach of contract, it had been required to expend an additional $5,-837 altering the foundations so as to comply with the general specifications. Dix Steel denied the breach of contract, claiming that the precontract negotiations and agreements had merged into the written construction contract as amended and that it had fully complied with the written

[*]Reported in 443 P.2d 532.

[1]Dix Steel commenced this action as plaintiff. Miles Construction answered, counterclaimed, and paid the amount demanded in plaintiff's complaint. The case was tried on the issues raised by Miles Construction in its counterclaim. Dix is appellant and Miles Construction is the respondent.

agreement. From conflicting evidence, the trial court was warranted in finding that the following occurred:

As a dealer for Inland Steel Products Company, Dix Steel sold metal buildings manufactured by that company on commission, and also engaged in the business of erecting them. Dix had originally planned to bid on the contract with Grant County Public Utility District No. 2 for the erection of some steel buildings at Wanapum Dam, and its officers had studied the specifications for the job. Because of financial problems, however, the company concluded that it could not undertake the whole contract. Miles Construction Company, defendant here, decided to bid on the job and its officers also studied the PUD's specifications.

Finding itself unable to bid on the entire contract, Dix Steel, through its president, Peter Dix, nevertheless, sought a part of it. Miles Construction knew that Dix Steel people had studied the plans and specifications for the contract preparatory to bidding on it, and so its officers talked the matter over with Peter Dix to see if Dix Steel would be interested in assuming a part of the job.

In a conversation with R. B. Miles of Miles Construction about May 13, 1963, Peter Dix, orally offering to undertake a part of the contract said that Dix Steel would

provide the labor and materials for the steel buildings in accordance with Section 5 of the specifications and the metal work in accordance with Section 6 of the Specifications and certain crane work for a price of $178,890.00.

According to the trial court's findings, this sum was several thousand dollars less than any other bids received by Miles Construction.

After receiving this bid from Dix, but before awarding Dix the contract, R. B. Miles, the president of Miles Construction, talked to Peter Dix who told him that the steel buildings Dix Steel intended to furnish would meet the requirements of section 5 of the specifications. Peter Dix could make that assurance because, as he said, his company had received a letter from its supplier, Inland Steel Products Company, stating that the steel buildings would conform to section 5. Thereafter, May 17, 1963, Dix Steel by

letter confirmed its previous parol offer, stating again that it would provide the steel buildings in accordance with section 5 and would also do the metal work in accordance with section 6 of the specifications and certain crane work—all for the price of $178,890.

Miles Construction, in making its bid to the Grant County PUD, relied upon and included the $178,890 bid of Dix Steel and was awarded the contract from the PUD. Eight days after the award and the signing of this contract, Miles Construction, June 11, 1963, in writing, confirmed its intent to award Dix Steel the contract for the steel buildings.

Dix Steel contends that it had not yet entered into an agreement with Miles Construction and that it made this clear at a meeting in Moses Lake in mid-June, 1963. But the trial court found from conflicting evidence of that meeting that the parties entered and left the meeting in almost complete agreement and that the differences resolved there were of such minor significance that the bid price of $178,-890 was not in any way altered in resolving them. Immediately after the Moses Lake conversations, Dix Steel Company proceeded with its designs and plans and work preliminary to performing its contract with Miles Construction. There was no way or means by which Dix could be reimbursed for this preliminary work except from the contract price of $178,890 to be paid by Miles Construction on completion of performance.

Shortly thereafter, Inland Steel, the supplier to Dix Steel, also proceeded with the designs and other work on the steel buildings. All three companies understood that Inland Steel would supply the materials and structural members for the buildings and that Dix Steel would erect them in addition to doing other work and supplying some parts in connection with doors, insulation and windows. Inland Steel also could look only to the $178,890 bid price as a source of payment, but, under the agreement, would pay Dix Steel a commission on the steel buildings.

Miles Construction Company started construction under its contract with the PUD, but Dix Steel, because of its inability to finance its subcontract, fell behind in its per-

formance. This in turn slowed down Miles Construction's performance. By the late fall of 1963, because of Dix's failure to provide the steel buildings on time, Miles Construction fell seriously in arrears. The PUD contract required that Miles complete its performance by June 1, 1964, and fixed liquidated damages of about $880 per day for any delay in completion.

Miles Construction, at Dix Steel's request, in an attempt to speed things, undertook to pay Inland Steel Company, Dix's supplier, directly for the steel buildings and paid Dix Steel Company directly for the labor. Thereafter, with this assurance of payment, Inland Steel Company supplied the buildings to Dix Steel. The buildings so supplied, while not of the type and style called for by the specifications, nevertheless, with alteration of the foundations, met the requirements of the contract. It was this change in style and type of building which gave rise to the present case.

Specification 5 called for "Warren" type trusses—a truss system that would be in the horizontal plane at eave height. The purpose of such design was to erect a structure, the stability of which would be contained in the walls, columns and roof. Instead, the buildings supplied by Inland and put up by Dix had neither the "Warren" type truss nor the stability as contemplated by the specifications, and Miles Construction, in order to bring the buildings up to the stability requirements of the specification, had to redesign the foundations and construct them as redesigned. This added work required a reasonable expenditure of $5,837 for the additional labor and materials utilized in building the redesigned foundations. Miles Construction brought this action to recover this sum claiming that amount as damages arising from a breach of contract. Dix now appeals a judgment in that sum awarded Miles Construction Company.

■ It is obvious from the foregoing recital that most of the points raised on appeal concern the resolution of the evidence by the trier of the facts. Despite the persuasiveness of the arguments summoned to support a reversal, our review of the record shows that the findings of fact were

amply supported by the evidence. Where the findings of fact are supported by substantial evidence, they will not be disturbed on appeal. *McDonald v. Parker*, 70 Wn.2d 987, 425 P.2d 910 (1967); *Harris v. Rivard*, 64 Wn.2d 173, 176, 390 P.2d 1004 (1964); *Most Worshipful Prince Hall Grand Lodge of Washington and its Jurisdiction, F. & A. M. v. Most Worshipful Universal Grand Lodge, A. F. & A. M. of Washington*, 62 Wn.2d 28, 31, 381 P.2d 130 (1963).

Dix Steel raises the proposition of a merger between the parties' earlier oral arrangements and their later formal written contract. Contending that the trial court erroneously treated the contract as coming into existence through the oral agreement of the parties, Dix insists that all of the negotiations should have been deemed merged into their subsequent written agreement and that the evidence showed no breach of the written contract but at most only a breach of the oral preliminary understanding.

Dix Steel contends that, under the doctrine of merger, Miles Construction became bound by a provision of the written contract that

> (f) Any changes, not specifically included, against the SUBCONTRACTOR by the CONTRACTOR, or against the CONTRACTOR by the SUBCONTRACTOR, for labor, services or materials supplied, or any other backcharges, will not be paid unless same have been agreed to in writing.

Miles Construction, contends Dix Steel, knew or should have known when it accepted Inland's design, that such design required and included a heavier foundation. Dix contends that since no changes were specified in writing by Miles Construction before installation of the heavier foundation, the added costs thereby incurred should impose no additional liability on Dix under the formal written contract.

■ We acknowledge and would adhere to the rule of contractual construction that

> when parties adopt a written agreement as the expression of their intentions, that instrument becomes the contract, and all negotiations and understandings previous thereto become merged into the agreement. *Vance v. Ingram*, 16 Wn.2d 399, 410, 133 P.2d 938 (1943).

*See also Sears, Roebuck & Co. v. Nicholas*, 2 Wn.2d 128, 132, 97 P.2d 633 (1939). As a general rule, preliminary negotiations between a subcontractor bidder and a general contractor merge as a matter of law in the formal written contract between them. Conversely, if there is no merger, the preliminary negotiation may constitute a separate contract. *Plumbing Shop, Inc. v. Pitts*, 67 Wn. 2d 514, 408 P.2d 382 (1965). Accordingly, although the preliminary negotiations and promises may, as a matter of fact, merge into and lose their separate identity in a formal written document generally, in some cases they do not do so. It all depends upon the parties' intentions, and these intentions, more often that not, are facts to be ascertained by the trial court or jury. The courts will uphold whatever lawful agreement the parties made with each other.

On conflicting but substantial evidence, the trial court found that the parties made two separate contracts. The first one came into existence when Dix Steel, intending that Miles act upon and incorporate the Dix proposal in its bid to the PUD, orally offered to provide the labor, materials and supervision relating to the steel buildings called for in specification 5, the metal work in specification 6 and certain crane work for the total price of $178,890. Miles Construction accepted this offer and, using Dix's figures, incorporated them into its own bid to the PUD. There is little doubt as to the mutuality of this undertaking for, when Miles Construction Company accepted Dix's offer, it too became bound by the contract thus created and, upon winning the contract by competitive bid, was obliged to engage Dix Steel to perform that part it had promised to do for the stated sum of $178,890.

The earlier oral agreement did not as a matter of law merge with and become a part of the formal written construction contract. *Barber v. Rochester*, 52 Wn.2d 691, 328 P.2d 711 (1958). And the trial court, as trier of the facts, found no merger as a matter of fact. Accordingly, the trial court was well within its power as trier of the facts to find from the evidence an oral contract to do the job in accord-

ance with the plans and specifications set forth in the formal written contract and that Dix Steel Company breached that oral agreement.

Affirmed.

WEAVER, ROSELLINI, and McGOVERN, JJ., and LANGENBACH, J. Pro Tem., concur.