[No. 5390–1. Division One. November 6, 1978.]

BAN–CO INVESTMENT CO., ET AL, *Respondents,* v. C. E. LOVELESS, ET AL, *Appellants.*

*Karr, Tuttle, Koch, Campbell, Mawer & Morrow* and *Joseph D. Holmes, Jr.,* for appellants.

*Inslee, Best, Chapin & Doezie, Evan E. Inslee,* and *Michael M. Fleming,* for respondents.

ANDERSEN, A.C.J.—

## FACTS OF CASE

The plaintiffs, owners of undeveloped land near Longview, recovered a judgment against the defendants, developers who developed a shopping center on the owners' land.[1] The developers appeal.

The case deals with the intricacies of the business of developing land into shopping centers, and particularly with the land acquisition and financing aspects of that business.

---

[1] The 36 pages of the findings of fact, conclusions of law and judgment specify in detail: the parties' relationships with each other; the ownerships and interests in the two parcels of land and businesses here involved; and the precise nature of the judgment and the parties against whom it was rendered. In the interest of convenience, however, the plaintiffs will herein be referred to together as the "owners" and the defendants will be referred to together as the "developers."

The parties signed numerous documents in connection with putting together a shopping center on the owners' land. We refer only to those pertaining directly to the present dispute.

Two straight option agreements were entered on March 5, 1971 and amended on August 30, 1971. Under their terms, the owners, for a stated consideration, granted the developers an option to purchase the owners' land for $165,000. It should be noted that a separate agreement was signed with respect to each of the owners' two parcels of land. Later, two other agreements dated October 5, 1971, were signed with respect to these parcels of land, and under these new agreements the owners ground leased the land to the developers and also granted the developers the option to purchase it for a total of $165,000 for the two parcels. Prior to the execution of the ground leases (with options to purchase land), the developers had been successful in obtaining a 25–year lease from a major tenant and in securing financing, and they had also let a contract for construction of a shopping center on the property.

The present dispute arose at the end of the term of the 3–year ground lease when the developers informed the owners that they were not going to exercise their options to purchase which were contained in the ground leases. The owners thereupon commenced the present action. Basically, the owners sought a decree of specific performance to compel the developers to purchase the land on the terms set forth in the options to purchase contained in the ground leases, and an accounting of all mortgage proceeds not spent by the developers on the construction and development of the shopping center.

It was the owners' claim that the developers asked for the ground leases (with options to purchase land) in order to obtain certain tax advantages and that in order to get them, they orally agreed with the owners that they (the developers) would exercise the options to purchase the land before the 3–year ground lease expired. The developers denied any such oral agreement.

The case was tried to the court between November 10 and December 3, 1976. Findings of fact, conclusions of law and judgment were entered on January 28, 1977.

The judgment decreed that the developers must specifically perform by purchasing the owners' land at the price and on the terms stated in the options to purchase contained in the ground leases. The developers were also ordered to pay $22,590.87 costs and attorneys' fees to the owners. The judgment contained an alternative provision to the effect that if the developers should default in the purchase obligations they were ordered to specifically perform, then they would have to pay the owners a money judgment in the sum of $88,100 plus interest.

Additional facts will be noted in connection with our discussion of the issues.

### BACKGROUND ON THE BUSINESS ASPECTS
### OF SHOPPING CENTER DEVELOPMENT

Although not essential to our decision, it is helpful to understand certain aspects of the business of developing shopping centers in order to more fully understand the nature of this controversy.

One of the Practising Law Institute's monographs on real estate law and practice explains various aspects of the shopping center business, particularly from the standpoint of the developer. 10 N. Kranzdorf & N. Underberg, Real Estate Law and Practice, *Business and Legal Problems of Shopping Centers—2d* (Practising Law Institute, Transcript Series 1970).

As to the significance of the developers' acquisition of the land by a ground lease, rather than outright purchase, the monograph (at page 53) explains:

Why would you want a ground lease? You can acquire control over a valuable piece of property without a large outlay of cash. Even if you have the money to purchase the property, it might be more profitably used in connection with the operation of the center. If you purchase the property, you can only deduct interest payments on your

tax return; you would not be permitted to deduct payments in reduction of principal. Rents under the ground lease, on the other hand, are fully deductible, and the tenant on the ground lease has the added advantage of depreciating his improvements.

The monograph notes (at page 51), with respect to the terms of a ground lease:

How long do you ground lease a piece of ground? The rule of thumb is: long enough to complete the requirements of permanent financing. You should have the right to renew or options to extend the term, as well as the right to cancel in the event the shopping center business goes bad. You ought to have the right to get out at the end of any given period of time.

In connection with obtaining the financing, the owners in the present case subordinated their fee title in the land to the construction mortgage as required by the terms of the ground leases (with options to purchase land). As to this, the monograph points out (at page 47) for the developers' guidance:

If the fee owner is unwilling to subordinate, however, then you have problems. The only other alternative in such a case is to try to finance through an unsubordinated leasehold mortgage. In this type of financing, the amount of the mortgage will be lower, the interest rates higher, the term shorter, and the occupancy requirements more formidable.

The developers' appeal presents two principal issues.

ISSUES

ISSUE ONE. Did the trial court violate the parol evidence rule or the statute of frauds in holding that the developers were bound by their oral promise to exercise the options to purchase the owners' land, which options were contained in the written and signed ground leases?

ISSUE TWO. Where the owners subordinated their fee title in the land to a construction loan obtained by the shopping center developers, did the trial court err in determining that under the agreements of the parties the developers had no right to use the construction loan proceeds for purposes

unconnected with construction and improvements on the property?

DECISION

ISSUE ONE.

CONCLUSION. The determination of the admissibility of parol evidence, and whether it established an oral agreement, was a factual determination under the circumstances presented. The trial court did not err in finding an oral agreement, as it did, based on all relevant, extrinsic evidence available to it and in then specifically enforcing that oral agreement.

The developers argue that evidence of the oral promise not expressed in the written agreements of the parties was barred by the parol evidence rule and that the trial court violated that rule in deciding as it did. See the statements of the rule in *Truck–Trailer Equip. Co. v. S. Birch & Sons Constr. Co.*, 38 Wn.2d 583, 590, 231 P.2d 304 (1951) and *Lynch v. Higley*, 8 Wn. App. 903, 908, 510 P.2d 663 (1973). They further argue that even if we uphold the trial court's finding of an oral agreement, such an agreement would constitute an oral agreement to purchase real estate and is therefore barred by the statute of frauds. *See* RCW 19.36-.010; RCW 64.04.010.

Here the trial court also found as facts that: the developers wanted a ground lease with an option to purchase the land because of tax advantages the ground lease would give them; the developers did make a collateral oral agreement whereby they promised the owners that if the owners leased them the land, the developers would exercise the option to purchase contained therein during the 3–year lease term; and the owners would not have executed the ground leases but for this promise made to them by the developers.

As we have often stated, the power of this court is appellate only and in factual matters is limited to ascertaining whether or not the findings are supported by substantial evidence. *Stringfellow v. Stringfellow*, 56 Wn.2d 957, 959, 350 P.2d 1003, 353 P.2d 671 (1960); *Charles*

*Pankow, Inc. v. Holman Properties, Inc.,* 13 Wn. App. 537, 542, 536 P.2d 28 (1975). In the present case there is substantial evidence to support the trial court findings. Furthermore, since the findings of fact have not been excepted to on appeal, we must in any event accept them as verities. *Selah v. Waldbauer,* 11 Wn. App. 749, 753, 525 P.2d 262 (1974). We therefore fully accept the trial court's findings with respect to the existence and terms of the oral agreement between the parties.

The developers present a strong argument buttressed by case authority that this court should hold that the parol evidence rule prohibited the trial court from reading anything into the ground leases (with options to purchase land) that is not contained within the four corners of those documents.

Unquestionably, anyone with an orderly bent of mind will find scant satisfaction in endeavoring to reconcile the several hundred parol evidence holdings of the appellate courts of this state. Apparently it has ever been thus with all appellate courts in their struggle to enunciate a rational, consistent, common–law parol evidence rule that will at one and the same time serve both the courts' function of doing justice to the parties and their traditional view as to the "sanctity" of written agreements. As Justice Foster, writing for the Supreme Court, reminded us,

> Dean Wigmore tells us that the "so–called Parol Evidence rule is attended with a confusion and an obscurity which make it the most discouraging subject in the whole field of Evidence." 9 Wigmore on Evidence 3, § 2400.

*Barber v. Rochester,* 52 Wn.2d 691, 696, 328 P.2d 711 (1958).

■■ The court in *Barber* thoroughly analyzed the rule and concluded:

> People have the right to make their agreements partly oral and partly in writing, or entirely oral or entirely in writing; and it is the court's duty to ascertain from all relevant, extrinsic evidence, either oral or written,

whether the entire agreement has been incorporated in the writing or not. That is a question of fact.

*Barber v. Rochester, supra* at 698.

In recent opinions of both this court and the State Supreme Court, *Barber* has continued to be approved and followed. In *Peter Pan Seafoods, Inc. v. Olympic Foundry Co.*, 17 Wn. App. 761, 766, 565 P.2d 819 (1977), we cited *Barber* and summarized the law thusly:

> In discussing this first assignment of error, we note that the parol evidence rule is one of substance and not one of evidence. *Diel v. Beekman*, 1 Wn. App. 874, 465 P.2d 212 (1970). As such, it has been stated that the trial court must hear *all* extrinsic evidence and determine if the parties intended the written agreement to be a complete integration. If the integration is complete, the written document stands and the parol evidence is disregarded. If the integration is incomplete, the written agreement is replaced or supplemented by the terms of the parol agreement. *Dix Steel Co. v. Miles Constr., Inc.*, 74 Wn.2d 114, 443 P.2d 532 (1968); *Barber v. Rochester*, 52 Wn.2d 691, 328 P.2d 711 (1958); *Diel v. Beekman, supra*. The determination on this issue—the admissibility of parol evidence—is one of fact to be determined in the instant case by the trial court as the trier of fact. *University Properties, Inc. v. Moss*, 63 Wn.2d 619, 388 P.2d 543 (1964); *Dawson v. Shearer*, 53 Wn.2d 766, 337 P.2d 46 (1959); *Hankins v. American Pac. Sales Corp.*, 7 Wn. App. 316, 499 P.2d 214 (1972). After a review of the record, we find substantial evidence to support the trial court's finding that parol evidence was admissible to show the terms of the contract that had not been reduced to writing.

Whether the oral agreement is viewed conceptually as a separate "collateral contract" (*see Vikingstad v. Baggott*, 46 Wn.2d 494, 498, 282 P.2d 824 (1955)), or as a "partially integrated contract" with one part oral and the other part written (*see University Properties, Inc. v. Moss*, 63 Wn.2d 619, 621, 388 P.2d 543 (1964)), the intent of the parties is the critical fact to be ascertained. *Dix Steel Co. v. Miles Constr., Inc.*, 74 Wn.2d 114, 119, 443 P.2d 532 (1968); 5 R. Meisenholder, Wash. Prac. § 121 (1965); 3 A. Corbin,

*Corbin on Contracts* § 582, at 460 (1960); *Lynch v. Higley, supra* at 908–12.

As stated in *Dix Steel Co. v. Miles Constr., Inc., supra* at 119:

> Accordingly, although the preliminary negotiations and promises may, as a matter of fact, merge into and lose their separate identity in a formal written document generally, in some cases they do not do so. It all depends upon the parties' intentions, and these intentions, more often than not, are facts to be ascertained by the trial court or jury. The courts will uphold whatever lawful agreement the parties made with each other.

In *Dix,* the court went on to affirm the trial court's finding of a breach of the oral contract holding:

> The earlier oral agreement did not as a matter of law merge with and become a part of the formal written construction contract. *Barber v. Rochester,* 52 Wn.2d 691, 328 P.2d 711 (1958). And the trial court, as trier of the facts, found no merger as a matter of fact. Accordingly, the trial court was well within its power as trier of the facts to find from the evidence an oral contract . . .

*Dix Steel Co. v. Miles Constr., Inc., supra* at 119.

In deciding the legal issue of whether or not an enforceable oral agreement is made out in the face of parol evidence rule objections, the decisions and text writers have placed particular emphasis on two objective factors extrinsic to the writing. These are first, that the additional term should not vary or contradict that which has been reduced to writing but must be additional to and consistent with the contents of the document, and second, that patently flimsy and improbable contentions should be treated as flimsy and improbable contentions. 3 A. Corbin, *Corbin on Contracts* § 583 (1960); 5 R. Meisenholder, Wash. Prac. § 121, at 129 (1965). In the present case, the terms of the written agreements were not varied, as such, by the oral agreement. The developers were conferred a *right* by the written option agreements contained in the ground leases, and by their oral agreement they *exercised* that right. Furthermore, the existence of the oral agreement was proven

by substantial evidence (including documentary evidence) other than merely the testimony of the parties alleging it.

The integration clauses in the ground leases (with options to purchase land) to the effect that the written documents constituted the entire agreement of the parties doubtless strengthened those written agreements in the view of the trial court, as they do in our view. Such clauses, however, were not conclusive in view of the trial court's findings of fact in this case and the substantial evidence supporting them. *Black v. Evergreen Land Developers, Inc.*, 75 Wn.2d 241, 250–51, 450 P.2d 470 (1969). *See also Dix Steel Co. v. Miles Constr., Inc., supra* at 118.

We have carefully reviewed the record presented.[2] We conclude that the trial court did not err when it found as a fact that the oral agreement to exercise the options did not merge with the written agreements and specifically enforced the options to purchase contained in· the ground leases. *Barber v. Rochester, supra; Dix Steel Co. v. Miles Constr., Inc., supra; Peter Pan Seafoods, Inc. v. Olympic Foundry Co., supra. See also Vikingstad v. Baggott, supra* (oral agreement to pay back $1,000 obtained by virtue of a previous earnest money agreement held not merged in a later earnest money agreement); *University Properties, Inc. v. Moss, supra* (oral agreement of a landlord to provide additional space held not merged in a written lease for a lesser portion of space).

Neither is the oral agreement to exercise the options rendered unenforceable because of the statute of frauds requiring that certain agreements be in writing. *See* RCW 19.36.010; RCW 64.04.010. In this jurisdiction, it is settled that the acceptance of a written option to purchase real estate is not invalid because it is oral. *Duprey v. Donahoe*, 52 Wn.2d 129, 133, 323 P.2d 903 (1958); *Spake v. Elder*, 1 Wn. App. 116, 121–22, 459 P.2d 820 (1969). The rationale is that the statute of frauds is sufficiently complied with in that situation since the detailed terms of the contract to

---

[2]Notably missing from the record is the trial court's oral decision.

sell are supplied by the writing signed by the parties to be held. *See* Annot., 30 A.L.R.2d 976 (1962). We see no valid reason why that same reasoning is not equally applicable in the present situation.

Having decided this issue on the basis noted, we do not address the additional grounds on which the trial court based its decision.

ISSUE TWO.

CONCLUSION. The trial court did not err in strictly construing the subordination agreement. As a court of equity in this specific performance case, the trial court also had the authority under its broad equity powers to fashion the additional remedy that it did in this regard.

The ground leases (with options to purchase land) provided that the land could be mortgaged by the developers for development and construction and to that end the owners subordinated their fee ownership to the lenders' mortgage. The developers borrowed some $665,000 thereon and certified to the lenders that all of that represented the cost of the building and other improvements. The trial court found, however, that $110,125 of that sum was not used for construction, costs of building and other improvements on the land.

The trial court then applied the percentage reduction factor contained in the lenders' commitments to this $110,125 figure and found "[t]hat if, in fact, the true cost had been certified, the [owners] would have been entitled to a reduction in the mortgage of $88,189.00 and the security of the [owners], in a second mortgage position, would have been enhanced accordingly." Finding of fact No. 12.

The trial court concluded that it would not be equitable to require both specific performance and a reduction of the mortgage balance owed by it to the lender, so it decreed by way of an alternative judgment, that if the developers should default in their purchase obligations that they were specifically ordered to perform, then they would have to pay the owners a money judgment of $88,100 plus interest.

The developers argue that they were entitled to do as they did—use the additional moneys received from the lenders to prepay rent to the owners, and for developers' overhead and a profit for themselves.

The owners respond to this in their brief as follows:

In effect, under [the developers'] interpretation, the [owners] in this case were alleged to have mortgaged their own property in order to make the payments to themselves for the lease down payment, the prepaid rent, and to allow [the developers] to make a payment to [the contractor who built the shopping center improvements] on [another] project completely unrelated to the Longview project.

And further,

Under [the developers'] theory, they were entitled to have it both ways; to–wit, (1) take the project and purchase it if feasible and desirable to themselves, or (2) if it doesn't look profitable then they can take a fee out of the mortgage proceeds, take all excess mortgage proceeds, do with it as they desired and leave [the owners] subordinated to an inflated construction mortgage holding a project that [the developers] themselves determined was unprofitable. Under this theory, [the developers] took no risk whatsoever, they had themselves covered both ways and could not lose.

We think that the better rule is that subordination agreements of this kind are to be strictly construed. *Miller v. Citizens Sav. & Loan Ass'n,* 248 Cal. App. 2d 655, 662–63, 56 Cal. Rptr. 844, 850–51 (1967) is in point:

Subordination arrangements are in the nature of a mutual enterprise, wherein the vendor provides the land, the purchaser the "know how" and the purchaser's lending agency the capital, for the mutually beneficial purpose of developing the land and disposing of it (usually by sale; occasionally by rental), to provide a fund out of which the vendor is paid for his land, the lender is repaid its loan with interest, and the purchaser receives compensation for his efforts and skill. Because of their nature, "The law is well settled that rights of priority under an agreement of subordination extend to and are limited strictly by the express terms and conditions of

the agreement. [Citations.]" (*Irvine* v. *California Cotton Credit Corp.* (1937) 18 Cal.App.2d 761, 763 [64 P.2d 782].) While it may not be impossible that a vendor has agreed to subordinate his purchase money lien to a lien secured by the purchaser to be used for purposes entirely apart from the mutual enterprise, such an arrangement would be so unusual and so unlikely that we would require it to be spelled out with particularity. Typically the loan proceeds are to be used for purposes which will promote the mutual enterprise and which will either enhance the vendor's equity in case he must foreclose his lien, or will provide funds from which he will be paid. A subordination agreement should be construed, unless it expressly provides otherwise, as permitting the loan proceeds to be used only for such purposes.

(Footnotes omitted.) *Accord, Pollock v. Tiano,* 253 Cal. App. 2d 183, 61 Cal. Rptr. 235, 238 (1967); *Ruth v. Lytton Sav. & Loan Ass'n,* 266 Cal. App. 2d 831, 72 Cal. Rptr. 521, 527–28 (1968).

In view of the facts found, and the wording of the subordination agreement and the financing documents connected therewith, we cannot say that the trial court erred in construing the agreements as it did. Nor was the alternative judgment otherwise erroneous. An action for specific performance of a contract, such as the case before us, is an equitable proceeding and when the equitable jurisdiction of the court is invoked by the parties, whatever relief the facts warrant will be granted. *Kreger v. Hall,* 70 Wn.2d 1002, 1007–08, 425 P.2d 638 (1967).

The developers' assignments of error addressed to the trial court's award of attorneys' fees to the owners is unaccompanied by citation of authority and does not appear on its face to be meritorious. It is therefore denied. *State v. Young,* 89 Wn.2d 613, 625, 574 P.2d 1171 (1978); *Krause v. McIntosh,* 17 Wn. App. 297, 303, 562 P.2d 662 (1977). The owners' request for attorneys' fees on appeal does not comply with RAP 18.1(c), therefore, it, too, is denied.

Affirmed.

McINTURFF and WILLIAMS, JJ., concur.