[No. 3985–1. Division One. June 13, 1977.]

PETER PAN SEAFOODS, INC., ET AL, *Respondents,* v. OLYMPIC FOUNDRY COMPANY, *Appellant.*

*Reed, McClure, Moceri & Thonn, William Robert Hickman,* and *John D. Wilson, Jr.,* for appellant.

*Madden & Poliak, Allan L. MacDougall,* and *Charles Davis,* for respondents.

SWANSON, J.—Olympic Foundry Co. (Olympic) appeals from a judgment entered against it in favor of Peter Pan Seafoods, Inc. (Peter Pan) for breach of warranty, both express and implied, written and verbal, concerning the sale of a diesel engine by Olympic to Peter Pan.

The facts are not in substantial dispute and may be summarized as follows. In the latter part of 1970, Peter Pan and John Chicoratich entered into an agreement whereby Peter Pan would finance the construction of a purse seine fishing vessel to be known as the F/V *Lady Marilyn* in consideration for the delivery by Chicoratich of his annual

salmon catch to Peter Pan. Incident to that financing, Peter Pan purchased the major component parts of the vessel. The defendant, Olympic Foundry Co., did business as Olympic Marine, and during the years 1970 and 1971 was engaged in the business of selling and installing marine diesel engines. In late 1970, Chicoratich, along with Thomas Nelsen who had entered into a similar finance agreement with Peter Pan, came in contact with a sales representative from Olympic Marine who endeavored to sell them two D–232 V–8 MWM diesel engines for use in the fishing vessels being constructed for Chicoratich and Nelsen.

In February of 1971, Chicoratich and Nelsen each agreed to purchase from Olympic Marine a D–232 V–8 MWM diesel engine and certain related equipment for use aboard their respective fishing vessels. The contract price of the engine purchased for Chicoratich amounted to $8,800. The trial court found that the contract terms of the sale were expressed in three written documents: (1) a letter dated January 1, 1971, from Olympic Marine to Peter Pan; (2) a Peter Pan purchase order dated February 17, 1971; and (3) the written MWM warranty. In addition to these written provisions, the trial court found that a complete integration of the applicable contract terms had not been manifested. As a result, the trial court determined from the evidence presented that Olympic Marine had orally warranted to Chicoratich and Peter Pan that the engines would deliver 204 to 206 brake horsepower at 2,300 r.p.m.; that if the engine did not perform as represented, or to the satisfaction of Chicoratich, it could be removed from the vessel at Olympic's expense; that Olympic would maintain spare parts for the engine; and that the engine for Chicoratich's vessel would be delivered to meet the boat builder's requirements, while the second engine for Nelsen's vessel would be delivered April 15, 1971.

Delivery of Chicoratich's engine on or about March 18, 1971, was timely and met with the boat builder's requirement; however, the Nelsen engine was not delivered until May 17, 1971, approximately 1 month after the boat

builder was ready for the engine. Inasmuch as the boat builder was engaged in the construction of the two fishing vessels on a simultaneous basis, the delayed delivery of Nelsen's engine brought a halt to the construction of both boats pending the engine arrival. When the second engine arrived, construction on the vessels was resumed with the result that both vessels were not ready for operation until mid–June of 1971.

Chicoratich used his newly constructed vessel during the fishing season of 1971. At that time, Chicoratich complained to Olympic that the engine emitted smoke at 2,300 r.p.m., causing the lowering of engine speed with a consequent reduction in horsepower. Chicoratich also complained of excessive oil consumption. As a result of these engine disabilities, Chicoratich brought his vessel back to Seattle following the end of the Alaskan salmon fishing season.

In November of 1971, MWM, the German manufacturer of the engines, dispatched a mechanic from its Mannheim offices to correct the oil consumption problem. Following the repair of Nelsen's vessel, a 24–hour test was conducted with the results showing that the repaired engine consumed oil at a rate consistent with the manufacturer's specifications. However, when the manufacturer's mechanics requested to examine Chicoratich's engine for the purposes of repair, he refused, saying that the defects in Nelsen's engine had not in fact been alleviated.

In December of 1971, both Chicoratich and Nelsen removed from their respective vessels the MWM engines purchased and installed by Olympic. Neither Chicoratich nor Nelsen notified the seller of the removal of the engines until May of 1972 when they were tendered back to Olympic with a demand for a return of the purchase price. Olympic refused to accept this tender.

In April of 1974, Peter Pan and Chicoratich filed suit against Olympic setting forth three causes of action: (1) negligence and breach of warranty relative to a power takeoff which resulted in lost fishing profits (this cause of action was settled prior to trial), (2) breach of warranty

relative to an engine, and (3) breach of promise as to delivery of an engine. The court, after making findings of fact and conclusions of law, entered judgment in favor of Chicoratich and Peter Pan in the amount of $21,732.85.[1] Olympic appeals.

Olympic initially assigns error to the trial court's finding that the written contract was not the final agreement between the parties. It is appellant's position that evidence of any oral warranties made by Olympic should not have been admitted into evidence since such admittance would be in violation of the parol evidence rule. RCW 62A.2-202. Moreover, appellant argues that the trial court in effect found that the oral warranties provided for a "sale or return" transaction as defined by RCW 62A.2-326:

(1) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is
(a) a "sale on approval" if the goods are delivered primarily for use, and
(b) a "sale or return" if the goods are delivered primarily for resale.
. . .
(4) Any "or return" term of a contract for sale is to be treated as a separate contract for sale within the statute of frauds section of this Article (RCW 62A.2-201) and as contradicting the sale aspect of the contract within the provisions of this Article on parol or extrinsic evidence (RCW 62A.2-202).

If appellant's argument were to be accepted, subsection 4 of RCW 62A.2-326 would require any "or return" provision to be in writing. Accordingly, appellant asks this court to find that the trial court erred when it gave effect to an oral "or return" provision.

---

[1] The trial court arrived at this figure by allowing plaintiffs to recover the purchase price of the engine together with interest at 6 percent per annum from the date of tender, May 27, 1972, to the date of entry of the judgment. However, from this figure the court deducted one-seventh of the purchase price or $1,257.14 as compensation for the use of the engine during the 1971 fishing season. In addition, the court allowed recovery for 12 days' loss of fishing profits ($12,705.99) as well as the cost of removal of the MWM engine ($500).

■ In discussing this first assignment of error, we note that the parol evidence rule is one of substance and not one of evidence. *Diel v. Beekman*, 1 Wn. App. 874, 465 P.2d 212 (1970). As such, it has been stated that the trial court must hear *all* extrinsic evidence and determine if the parties intended the written agreement to be a complete integration. If the integration is complete, the written document stands and the parol evidence is disregarded. If the integration is incomplete, the written agreement is replaced or supplemented by the terms of the parol agreement. *Dix Steel Co. v. Miles Constr., Inc.*, 74 Wn.2d 114, 443 P.2d 532 (1968); *Barber v. Rochester*, 52 Wn.2d 691, 328 P.2d 711 (1958); *Diel v. Beekman, supra*. The determination of this issue—the admissibility of parol evidence—is one of fact to be determined in the instant case by the trial court as the trier of fact. *University Properties, Inc. v. Moss*, 63 Wn.2d 619, 388 P.2d 543 (1964); *Dawson v. Shearer*, 53 Wn.2d 766, 337 P.2d 46 (1959); *Hankins v. American Pac. Sales Corp.*, 7 Wn. App. 316, 499 P.2d 214 (1972). After a review of the record, we find substantial evidence to support the trial court's finding that parol evidence was admissible to show the terms of the contract that had not been reduced to writing.

■ Notwithstanding the fact that the parol evidence rule does not apply to the present circumstances, if we accept appellant's contention that the contract contained a "sale or return" provision, then we are also compelled to find that such a provision must be in writing. RCW 62A.2–326(4). The distinction between a "sale on approval" and a "sale or return" is evident from Official Comment 1, RCWA 62A.2–326:

> A "sale on approval" or "sale or return" is distinct from other types of transactions with which they have frequently been confused. The type of "sale on approval," "on trial" or "on satisfaction" dealt with involves a contract under which the seller undertakes a particular business risk to satisfy his prospective buyer with the appearance or performance of the goods in

question. The goods are delivered to the proposed purchaser but they remain the property of the seller until the buyer accepts them. The price has already been agreed. The buyer's willingness to receive and test the goods is the consideration for the seller's engagement to deliver and sell. The type of "sale or return" involved herein is a sale to a merchant whose unwillingness to buy is overcome only by the seller's engagement to take back the goods (or any commercial unit of goods) in lieu of payment if they fail to be resold. *These two transactions are so strongly delineated in practice and in general understanding that every presumption runs against a delivery to a consumer being a "sale or return" and against a delivery to a merchant for resale being a "sale on approval."*

(Italics ours.) Because the provision before us is not of the type denominated a "sale or return" but rather is more analogous to a "sale on approval," the requirements of a writing imposed by RCW 62A.2–326(4) are not appropriate. *See* 1 R. Anderson, *Uniform Commercial Code* § 2–326:3, at 776 (2d ed. 1970); 3A R. Duesenberg & L. King, *Sales & Bulk Transfers under the Uniform Commercial Code* § 11.04, at 11–32.4 (1976). For the foregoing reasons we find that the trial court did not err in ruling that the oral warranties were a part of the agreement between the parties.

Appellant's next assignment of error is directed primarily to the trial court's conclusion of law No. 2 in which it stated:

In the absence of a contractual condition requiring plaintiff purchaser to allow defendant seller to attempt to remedy defects in the engine, plaintiff had no obligation to surrender the vessel and engine for that purpose.

Appellant asserts that such a statement is in error as a matter of law since RCW 62A.2–508 grants to the seller the right to cure a defective tender of goods. On the other hand, respondents contend that the product was expressly warranted by the seller to be reasonably satisfactory to the buyer. *See* RCW 62A.2–313.[2] When the buyer's satisfaction

---

[2] "(1) Express warranties by the seller are created as follows:

"(a) Any affirmation of fact or promise made by the seller to the buyer which

was not met, respondents would have us say that no right existed which would allow the seller to repair the reputed defects.

█ Although there appears to be some support for the conclusion reached by the trial court, *see* 77 C.J.S. *Sales* § 340 (1952), the controlling rule is as stated in RCW 62A.2–508:

> (1) Where any tender or delivery by the seller is rejected because non–conforming and the time for performance has not yet expired, the seller may seasonally notify the buyer of his intention to cure and may then within the contract time make a conforming delivery.
>
> (2) Where the buyer rejects a non–conforming tender which the seller had reasonable grounds to believe would be acceptable with or without money allowance the seller may if he seasonably notifies the buyer have a further reasonable time to substitute a conforming tender.

Within certain defined situations, the seller, under this code section, has a right to cure a defective tender both within the time fixed for performance, RCW 62A.2–508(1), as well as after the performance period has expired. RCW 62A.2–508(2). *See also* Washington Comments, RCWA 62A.2–508. The question thus becomes whether or not the time for performance had occurred when Olympic requested to inspect Chicoratich's vessel. The contract terms as found by the trial court do not provide for a time in which the buyer must either affirm or reject the tender.

relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

"(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

"(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

"(2) It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."

However, RCW 62A.2–327(1)(b)[3] provides that when a sale is on approval acceptance occurs after failure to seasonably[4] notify the seller of a rightful rejection. In deciding whether or not the time for performance has occurred, it is, we believe, important to recognize that the written warranty provides for a period of 6 months in which the manufacturer agrees to repair defects or replace any parts. This 6–months' period appears to be a reasonable length of time in which the buyer—Mr. Chicoratich—would be able to test the engine to his satisfaction and in which the seller would be able to correct any nonconformity. In so holding that a reasonable time for acceptance or rejection of the engine would be 6 months from the date it was put into operation—some time in the middle of June 1971—it follows that at the time Olympic requested to inspect plaintiff Chicoratich's engine in November of 1971, the time for performance had not yet occurred. Accordingly, the seller, Olympic Marine, had the right under RCW 62A.2–508(1) to seasonably notify the buyer of his intention to cure the complained–of defect. Once having done this, the buyer must then allow the seller to correct the nonconforming tender. We find the buyer's failure to allow repair negated the warranty provisions of the contract. *Wilson v. Scampoli*, 228 A.2d 848 (D.C. 1967); *Reece v. Yeager Ford Sales, Inc.*, 155 W. Va. 453, 184 S.E.2d 722 (1971); *General Motors Corp. v. Halco Instr., Inc.*, 124 Ga. App. 630, 185 S.E.2d 619 (1971).

---

[3] "(1) Under a sale on approval unless otherwise agreed

. . .

"(b) use of the goods consistent with the purpose of trial is not acceptance but failure seasonably to notify the seller of election to return the goods is acceptance, and if the goods conform to the contract acceptance of any part is acceptance of the whole[.]"

[4] RCW 62A.1–204 defines seasonably as follows:
"(1) Whenever this Title requires any action to be taken within a reasonable time, any time which is not manifestly unreasonable may be fixed by agreement.
"(2) What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action.
"(3) An action is taken 'seasonably' when it is taken at or within the time agreed or if no time is agreed at or within a reasonable time."

■ Appellant's next assignment of error is closely associated with our previous discussion. Here, appellant argues that the buyer's attempted revocation of acceptance in May of 1972 was ineffective. Treating the subject transaction as a "sale on approval," the failure to seasonably notify Olympic of election to return the engine and the failure to allow Olympic to cure any defects constituted acceptance. RCW 62A.2–327(1)(b).[5] Once acceptance was effected, the buyer must then utilize the provisions of RCW 62A.2–608 in order to properly revoke his acceptance:

(1) The buyer may revoke his acceptance of a lot or commercial unit whose non–conformity substantially impairs its value to him if he has accepted it

(a) on the reasonable assumption that its non–conformity would be cured and it has not been seasonably cured; or

(b) without discovery of such non–conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

We find no evidence within the record to indicate that the buyer rightfully revoked his acceptance of the goods in a reasonable manner in accordance with the applicable code section. On the contrary, it appears that the buyer was aware of the alleged defect almost from the day the engine was put into use in June of 1971. Yet, no notice was given to the seller of revocation until May of 1972. The Uniform Commercial Code imposes a duty of good faith upon all its transactions, RCW 62A.1–203; a delay of nearly 6 months by the buyer in informing the seller of his intended revocation is insufficient compliance with the good faith obligation.

---

[5]See footnote 3.

■ Appellant's final assignment of error is directed to the trial court's finding that the second engine manufactured in Germany would be delivered on or about April 15, 1971, or to meet the boat builder's requirements. When the engine was not delivered until May of 1971, the trial court found that Olympic had breached its oral warranty of delivery. The warranty provision as found by the trial court is based upon substantial evidence contained within the record. Even though conflicting evidence was presented by Olympic, we are not at liberty to alter findings based upon substantial evidence. *Hudson House, Inc. v. Rozman,* 82 Wn.2d 178, 509 P.2d 992, 61 A.L.R.3d 1163 (1973); *Sylvester v. Imhoff,* 81 Wn.2d 637, 503 P.2d 734 (1972); *Worthington v. Worthington,* 73 Wn.2d 759, 440 P.2d 478 (1968).

In summary, we find that the trial court was correct in allowing parol evidence as to oral warranties and in finding that such warranties were part of the contract. Thus, the amount recoverable by Chicoratich representing his lost fishing profits caused by the delay in delivering the engine must be affirmed. However, in all other respects, the judgment is reversed.

Affirmed in part; reversed in part.

FARRIS, C.J., and WILLIAMS, J., concur.

Petition for rehearing denied September 27, 1977.

Review by Supreme Court pending April 14, 1978.