IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Parental Rights to: <br><br> R.E.L.-G. | No. 84588-8-I (consolidated with No. 84612-4-I) <br><br> DIVISION ONE <br><br> UNPUBLISHED OPINION |

SMITH, C.J. — E.C. and A.L.G.'s parental rights to their child, R.E.L.-G., were terminated after a trial. Both parents appeal. The mother, E.C., challenges the court's determination that termination was in R.E.L.-G.'s best interest and asserts remand is necessary for the court to (1) enter sibling relationship findings and (2) to correct scrivener's errors in the termination order. The father, A.L.G., contends (1) that the Department of Children, Youth, and Families did not timely offer him all court-ordered services and necessary services to address his parenting deficiencies, (2) that the court erred in concluding some court-ordered services were futile, and (3) that the court erred in concluding termination was in R.E.L.-G.'s best interest. We affirm, but remand for the court to enter findings as to R.E.L.-G.'s sibling relationships and to correct a scrivener's error.

## FACTS

The mother and father have two children together: R.E.L.-G., born June 26, 2015, and O.K., born July 27, 2017. The mother also has three older children, E.B., Av.B., and An.B. The Department of Children, Youth and Families

(Department) filed a dependency petition as to R.E.L.-G. in July 2015, when R.E.L.-G. was one-month-old, due to concerns about unsafe home conditions. The court initially placed R.E.L.-G. in her mother's care with certain conditions. A few months later, when R.E.L.-G. was five months old, the mother violated the placement conditions and R.E.L.-G. was removed and placed with a family friend. Two months after that, at the family friend's request, R.E.L.-G. was removed and placed in foster care. R.E.L.-G. was returned to the family friend—where her father was living—one month later.

In February 2016, R.E.L.-G. was taken to the emergency room at Seattle Children's Hospital with injuries inside her mouth, and bruises on her back, chin, and face. The emergency room doctor noted that "[b]ruising in any non-mobile infant is very concerning for non-accidental trauma;" "the bruises on [R.E.L.-G.'s] back could be concerning for being gripped by a hand;" the "chin bruise [was] concerning for direct blunt trauma;" and the mouth trauma was "much more concerning for a solid object being forced down [R.E.L.-G.'s] throat." The father was arrested and charged with third degree domestic violence assault of a child.

Dependency was established in July 2016 as to both parents through agreed orders. The mother was ordered to complete a psychological evaluation with a parenting component and to attend mental health counseling, and follow all recommendations from these services. The father was ordered to complete a drug and alcohol evaluation, undergo random urinalysis, to complete a psychological evaluation with a parenting component, and follow all recommendations from these services.

2

In August 2016, the father was convicted of fourth degree domestic violence child assault against R.E.L.-G. because of the bruising observed at Seattle Children's Hospital. But the father maintained his innocence and denied R.E.L.-G. was injured; rather, he claimed R.E.L.-G.'s bruising was actually congenital dermal melanocytosis[1] and that her other injuries were caused by bronchitis or self-inflicted. The criminal court sentenced the father to 180 days in jail and ordered him to engage in the services ordered in R.E.L.-G.'s dependency case.

The father participated in the Supporting Early Connections program with R.E.L.-G. through Navos. That program focuses on enhancing the parent-child relationship through parent coaching. After dependency was established, the father visited R.E.L.-G. about thirteen times in 2016, fifty times in 2017, and ten times in 2018.

In June 2020, the court ordered R.E.L.-G. to be returned to her mother within the month. But during R.E.L.-G.'s first unsupervised visit with the mother, she sustained a severe burn to her leg; the Department later made an administrative finding of neglect based on this incident. Despite this incident, and over the Department's protests, R.E.L.-G. was placed in her mother's care in August 2020.

In November 2020, R.E.L.-G.'s trial return home ended when law enforcement removed R.E.L.-G. and her siblings from her mother's care. A child

---

[1] Congenital dermal melanocytosis is the appearance of flat gray-blue marks at or shortly after birth. Because of their blue coloring, these marks can resemble bruises.

protective services investigator reported that all five children were home alone in extremely unsanitary conditions—numerous animals, both alive and dead, were present, and there were extensive amounts of urine and fecal matter on the floor. The children told the investigator that they had last eaten the day before. All five children were placed in out-of-home care. R.E.L.-G. was placed in an emergency foster care placement and then went to live with her current foster family.

In the meantime, the father had disappeared entirely from the proceedings. From September 2018 to February 2021, the father did not visit with R.E.L.-G. and Department efforts to contact him were unsuccessful.

In January 2021, the court updated the mother's service plan, ordering a psychological evaluation with a parenting component, a mental health evaluation, a drug and alcohol evaluation, and a one-time urinalysis with subsequent weekly random urinalysis. Dr. Tatyana Shepel, a licensed clinical psychologist, diagnosed the mother with personality disorder, animal hoarding disorder, and somatic symptom disorder. The mother sporadically made reluctant efforts to engage in mental health services and largely denied the need for treatment of her diagnoses. The court found that there was no evidence that any of the services offered to the mother resulted in any long-term progress.

In June 2021, a few months after the father reengaged in the proceedings, the court ordered an updated service plan for him, too. He was ordered to complete an updated psychological evaluation with a parenting component, a substance use disorder assessment, random urinalysis, and an evidence-based

4

in-home parenting class. He was directed to follow all recommendations from the ordered services.

The father was referred to urinalysis testing in late March 2021. He tested positive for cocaine and cannabis, but claimed the positive test result for cocaine was caused by his use of lidocaine cream. The father missed six subsequent urinalysis appointments. In October 2021, the father started the Positive Parenting Program (Triple P) with therapist Hayward Coleman. Mr. Coleman observed R.E.L.-G. and the father together for three visits, but R.E.L.-G. eventually refused to attend more sessions.

The Department petitioned for termination in November 2021. Following trial, the trial court terminated both parents' rights as to R.E.L.-G. As to the mother, the court found that her lack of progress, reluctance to acknowledge her diagnoses, and inability to take responsibility for her actions leading to the dependency supported termination. As to the father, the court determined that although he had engaged in services, the strain in his relationship with R.E.L.-G., caused by his lengthy absence, was beyond repair and rendered additional services futile.

Both parents appeal.

ANALYSIS

Standard of Review

We review a trial court's decision to terminate parental rights by considering "whether substantial evidence supports the trial court's findings of fact by clear, cogent, and convincing evidence." In re Parental Rights to K.M.M.,

186 Wn.2d 466, 477, 379 P.3d 75 (2016). " 'Clear, cogent and convincing' " means the facts shown are highly probable. In re Welfare of M.R.H., 145 Wn. App. 10, 24, 188 P.3d 510 (2008) (quoting In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995). Termination proceedings are "highly fact-specific" and we defer to "the trial court's determinations of witness credibility and the persuasiveness of the evidence." K.M.M., 186 Wn.2d at 477. We review de novo whether the trial court's findings of fact support its conclusions of law. K.M.M., 186 Wn.2d at 477.

Provision of Services

The father contends that the Department failed provide him with all court-ordered and necessary services as required by RCW 13.34.180(1)(d) because it did not provide recommended attachment services in a timely fashion. He also argues that RCW 13.34.180(1)(d)'s requirement that services be "reasonably available" applies only to necessary services and not to court-ordered services; therefore, he asserts, the futility doctrine can only apply to necessary services. Finally, he claims that the Department failed to provide him any services to meet R.E.L.-G.'s special needs.

We disagree that the Department failed to offer services in a timely manner. We also decline to read RCW 13.34.180(1)(d) as limiting the futility doctrine to only necessary services and affirm the trial court's finding that, despite being court-ordered, the attachment services the father sought were futile. And we also conclude that the father received all necessary services to address R.E.L.-G.'s special needs.

Before parental rights can be terminated, the Department must prove the six elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence. RCW 13.34.190(1)(a)(i). At issue here is the fourth element, which requires the Department provide all court-ordered and necessary services reasonably available and capable of correcting parental deficiencies. RCW 13.34.180(1)(d). "Necessary services" are "services 'needed to address a condition that precludes reunification of the parent and child.' " K.M.M., 186 Wn.2d at 480 (quoting In re Dependency of A.M.M., 182 Wn. App. 776, 793, 332 P.3d 500 (2014)). The Department must "identify a parent's specific needs and provide services to meet those needs." In re Parental Rights to I.M.-M., 196 Wn. App. 914, 924, 385 P.3d 268 (2016).

1. Timely Services

The father contends that the Department failed to provide him attachment services in a timely manner. He asserts that the Department should have provided attachment services in February 2021, when he reappeared. Because the father was provided with attachment services from the outset of the proceedings and was also provided attachment services a few months after he reengaged with the proceedings, we disagree.

The timeline of the father's involvement throughout the dependency proceeding helps frame this issue. In the November 2016 dispositional order, the court ordered the Department to refer the father to infant mental health services through Navos, which it did. For a time, the father engaged in the Navos Supporting Early Connections Program, which is an attachment service. This

7

program provides parent coaching and aims to strengthen the parent-child relationship.[2] But in September 2018, the father vanished from R.E.L.-G.'s life and remained absent for two-and-a-half years, until February 2021. Department efforts to contact the father during that time were unsuccessful. In February 2021, the father suddenly resurfaced and began reengaging with proceedings.

The father claims that after he came forward in February 2021, the Department was untimely in referring him to attachment services because it knew or should have known that attachment services were necessary. But this narrative is not entirely accurate. The father was provided attachment services at the outset of the dependency proceedings and chose to absent himself from R.E.L.-G.'s life. And when the father did reengage with proceedings, he was offered attachment services only a few months later.

After the father reappeared in February 2021, the court did not order an updated service plan until June 2021. The Department was not required to refer the father to new services until after this court order. See RCW 13.34.180(1)(d) (Department must offer court-ordered services). The Department referred the father to a provider for his court-ordered psychological evaluation one month later, in mid-July 2021. In early August, the provider, Dr. Sierra Swing, informed the assigned social worker that there was a three to fourth month wait for an evaluation. Two months later, Dr. Swing contacted the father and the evaluation process started in late October. Around this time, the father was referred to and

---

[2] While he was participating in the case, the father had a few visits with R.E.L.-G. in 2016, many visits in 2017, and very few visits in 2018.

began Triple P, an attachment service. This five month period between the court's updated service plan and referral to an attachment service does not constitute an untimely delay.

We also note that the cases the father cites in support of services not being timely provided are unpersuasive. None of the cases delineate a clear test for when services are timely or untimely and their facts are distinguishable. In re Welfare of S.J. does not discuss timeliness, but rather concluded that the Department failed to offer necessary services where mental health and sobriety treatment were offered sequentially rather than concurrently. 162 Wn. App. 873, 881-82, 256 P.3d 470 (2011). The court based its reasoning on the legislature's finding that co-treatment of these issues was more effective than sequential treatment. S.J., 162 Wn. App. at 882. Here, the father did receive co-treatment. In re Parental Rights to B.P. focuses on futility and does not discuss timeliness (because no attachment services were ever provided) and its facts are not analogous to the present case. 186 Wn.2d 292, 376 P.3d 350 (2016). In B.P., the court concluded that the record did not contain clear, cogent, or convincing evidence that attachment services would be futile where evidence demonstrated that the mother was progressing well in individual and family therapy—a prerequisite for attachment services. 186 Wn.2d at 319-20. In contrast, here, an attachment service—Triple P—was provided to the father but additional attachment services were unnecessary and unlikely to succeed given R.E.L.-G.'s refusal to attend visits. Moreover, the father was not engaging sufficiently with

individual therapy to warrant a referral to family therapy as recommended by Dr. Swing.

In re Dependency of T.L.G. does discuss timeliness, but is distinguishable. 126 Wn. App. 181, 108 P.3d 156 (2005). There, the Department delayed the parents' evaluation by more than a year and simultaneously withheld services until the parents completed the evaluation. T.L.G., 126 Wn. App. at 203. The shelter care order in T.L.G. was entered in August 2001 but the Department did not provide a list of approved evaluators until April 2002 and the parents did not have their initial evaluation appointment until October 2002. 126 Wn. App. at 194, 201. Here, the father was referred to an evaluation one month after the court ordered it and the evaluation commenced four months later. And unlike the parents in T.L.G., the father here was referred to services contemporaneously with the evaluation process.

Because the father received attachment services at the outset of the dependency proceedings in 2016 and shortly after he reengaged in proceedings in 2021, we conclude that the Department did not fail to offer timely services.

2. Attachment Services

The father asserts that the Department did not provide attachment services as recommended, only a parenting coaching service. But the father was provided with attachment services, just not the additional services recommended by Dr. Swing.

In the November 2016 dispositional order, the court directed the Department to provide an infant mental health service—Supporting Early

Connections—through Navos. This service was "meant to strengthen his relationship with [R.E.L.-G.]." The GAL testified that this program "provides parenting coaching and focuses on the parent-child relationship and enhancing the relationship."

Then, in October 2021, the father started working with Hayward Coleman, a parenting coach who teaches Triple P (Positive Parenting Program). Triple P aims to "[s]trengthen the parent-child relationship, strengthen the overall attachment between the parent and child, [and] improve communication." Mr. Coleman testified that Triple P is meant to address the attachment between a parent and child. The father tries to characterize Triple P as merely a parenting service and argues that "Parent Child Interaction Therapy (PCIT) was the appropriate attachment service to be offered. But testimony demonstrated that both services are attachment services—PCIT is just a more intensive service. And testimony also demonstrates that the father could not yet benefit from more intensive attachment services: Triple P with R.E.L.-G. was unsuccessful after she began refusing to attend visits, and so PCIT was not available, and the father was not participating in individual therapy, a prerequisite for referral to family therapy.

### 3. Recommended Services

A court order required the father to complete an updated psychological evaluation and "follow through with all recommendations." The Department contends that PCIT and family therapy were not "recommended services," and

11

that consequently, they were not court-ordered services.  This is not true.  Both services were recommended, and therefore, court-ordered.

Dr. Swing's psychological evaluation of the father concluded that "[t]he following parenting services are recommended:"

- Parenting Services:
  - o [The father] should continue to engage in parent coaching and parenting classes.
  - o [The father] should consider engaging in Parent Child Interaction Therapy (PCIT) with [R.E.L.-G.] to address her behavior and any other concerns that are noted by the parent coach, visit supervisor, and/or foster parents.
- Family Therapy:

  If [R.E.L.-G.] has an established therapist that she feels safe with, and she decides to work on improving her relationship with her father, it will likely be most beneficial for her father to start attending appointments with [R.E.L.-G.] and her therapist for family therapy versus starting over with a new therapist.

The Department maintains that Dr. Swing's suggestion that the father "should consider engaging in [PCIT]" is not a "clear" recommendation.  It also avers that Dr. Swing did not "squarely" recommend family therapy because the report indicated that family therapy would be predicated on R.E.L.-G. wanting to work on her relationship with her father.  Neither of these arguments is meritorious. Dr. Swing's report states that "the following services are recommended" and then lists PCIT and family therapy.  It is unclear how these services were *not* clearly recommended, regardless of whether they were couched in the softening phrase "should consider."  The services were recommended by Dr. Swing and thus, court-ordered.

12

4. Court-Ordered Services & Futility

The father asserts that court-ordered services are not subject to RCW 13.34.180(1)(d)'s "reasonably available" and "capable of correcting the parental deficiencies within the foreseeable future" limitations. He argues that because the futility doctrine is rooted in these phrases, it cannot apply to court-ordered services. As a result, he claims that the court erred in concluding that offering certain court-ordered services—PCIT and family therapy—were futile. But contrary to the father's assertion, both necessary and court-ordered services must be reasonable. Thus, futility doctrine is not confined to necessary services.

Whether court-ordered services are subject to the futility doctrine is a matter of statutory interpretation that we review de novo. In re Dependency of W.W.S., 14 Wn. App. 2d 342, 358, 469 P.3d 1190 (2020). "Our fundamental goal in statutory interpretation is to 'discern and implement the legislature's intent.' " In re Parental Rights of K.J.B., 187 Wn.2d 592, 596, 387 P.3d 1072 (2017) (quoting State v. Armendariz, 160 Wn.2d 106, 110, 156 P.3d 201 (2007)). "If the statute's meaning is plain on its face, then courts must give effect to its plain meaning as an expression of what the legislature intended." Durant v. State Farm Mut. Auto. Ins. Co., 191 Wn.2d 1, 8, 419 P.3d 400 (2018). A statute is ambiguous if its plain language "remains susceptible to more than one reasonable meaning." Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 12, 43 P.3d 4 (2002). We avoid construing statutes in a way that produces an absurd result. Tingey v. Haisch, 159 Wn.2d 652, 663-64, 152 P.3d 1020 (2007).

13

The father asserts that futility doctrine is based in the language of RCW 13.34.180(1)(d), which requires

> [t]hat the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided.

He maintains that the phrases "reasonably available" and "foreseeable future" modify only "necessary services," not "services ordered."[3] But the futility doctrine is not confined to the language of RCW 13.34.180. Rather, it is better understood as being rooted in reasonableness—a requirement shared by both court-ordered and necessary services. An overview of the origins of the futility doctrine provides helpful context.

The futility doctrine originated in a footnote in In re Welfare of Aschauer, in which our Supreme Court concluded that the Department failed to show that all court-ordered and necessary services were offered or provided but that "[t]he offering of such services [] would have been a futile act." 93 Wn.2d 689, 699 n.6, 611 P.2d 1245 (1980). The Court reasoned that the Department "could not effectively offer [the mother] services" because she refused to move closer to the child and because "the prospect of improving [the mother's] parental capabilities within the foreseeable future was negligible." Aschauer, 93 Wn.2d at 699 n.6.

---

[3] Our Supreme Court recently declined to weigh in on whether court-ordered services were subject to the "reasonably available" and "foreseeable future" limitations in In re Parental Rights to D.H., 195 Wn.2d 710, 719, 464 P.3d 215 (2020).

Since its inception, the futility doctrine has been grounded in the requirement that services be reasonable and available. See, e.g., In re Welfare of Ferguson, 32 Wn. App. 865, 869-70, 650 P.2d 1118 (1982) ("Where the record indicates the offer of services would be futile, . . . clear, cogent, and convincing evidence would support a finding that *reasonable services* had been offered." (emphases added) (citations omitted)); In re Dependency of T.R., 108 Wn. App. 149, 163, 29 P.3d 1275 (2001) (parent must be willing and able to make use of services); In re Welfare of C.S., 168 Wn.2d 51, 56 n.2, 225 P.3d 953 (2010) (if additional services would be futile, court may make a finding that Department as offered all *reasonable services*); I.M.-M., 196 Wn. App. at 924 ("The Department is excused from providing *otherwise required services* if doing so would be futile." (emphases added)).

This requirement is mirrored in the statutory framework for court-ordered and necessary services. RCW 13.34.136(2)(b)(vii), which addresses court-ordered services, states that "[t]he department shall provide all reasonable services." Similarly, RCW 13.34.180(1)(d), which concerns necessary services, states that these services must be "reasonably available, capable of correcting the parental deficiencies within the foreseeable future." Both statutory provisions make clear that all services, whether court-ordered or necessary, are subject to a reasonableness requirement. Moreover, case law has applied the futility doctrine to both court-ordered and necessary services, though the majority of cases

discuss futility in the context of the latter.[4]  See, e.g., In re Dependency of M.-A.F.-S., 4 Wn. App. 2d 425, 460-62, 421 P.3d 482 (2018) (futility applied to court-ordered services); B.P., 186 Wn.2d at 297 (futility not applicable where Department failed to provide all necessary services); K.M.M., 186 Wn.2d at 483 (futility discussed in context of necessary services).

The application of futility doctrine to court-ordered and necessary services is also supported by the legislative intent behind dependency and termination proceedings.  In these proceedings, the legislature has declared that "the child's health and safety shall be the paramount concern" and that children have a "right to a safe, stable, and permanent home and a speedy resolution of any proceeding."  RCW 13.34.020.  Exempting court-ordered services from futility analysis would require the Department to keep providing services past the point of reasonableness and would conflict with the legislature's goal of providing a speedy resolution to dependency and termination proceedings.

We therefore conclude that the futility doctrine applies to both court-ordered and necessary services.  We now consider whether the court erred in finding that offering the father the court-ordered services of PCIT and family therapy would have been futile.

" 'Where the record establishes that the offer of services would be futile, the trial court can make a finding that the Department offered all reasonable

---

[4] And this result makes sense, given that what constitutes a "necessary service" is inevitably broader than the services ordered by the court.  Therefore, litigants are likely to have more success by arguing the Department failed to offer them all necessary services.

services.' " K.M.M., 186 Wn.2d at 483 (quoting C.S., 168 Wn.2d at 56 n.2). "The provision of services is futile where a parent is unwilling or unable to participate in a reasonably available service that has been offered or provided." K.M.M., 186 Wn.2d at 483; see also In re Dependency of Ramquist, 52 Wn. App. 854, 861, 765 P.2d 30 (1988) ("[A] parent's unwillingness or inability to make use of the services provided excuses the [S]tate from offering extra services that might have been helpful."). Provision of additional services may also futile if the service would not remedy the parent's deficiencies within the foreseeable future. T.R., 108 Wn. App. at 164; see also K.M.M., 186 Wn.2d at 486. "The 'foreseeable future' is determined from the point of view of the child." K.M.M., 186 Wn.2d at 486 (quoting In re Welfare of Hall, 99 Wn.2d 842, 850-51, 664 P.2d 1245 (1983)). "[A] finding that services would be futile must be supported by clear and convincing evidence." In re Welfare of D.H., 25 Wn. App. 2d 502, 531, 523 P.3d 255 (2023).

Here, testimony at trial and the record established that offering the father further attachment services would be futile because "the parent-child relationship was so destroyed by the father's conduct over the years that [R.E.L.-G.] refused to participate in visits or this type of service." Moreover, in order to provide the father with the attachment services Dr. Swing recommended, "[R.E.L.-G.] would have been required to be forced to attend and participate at the expense of her psychological well-being."

Testimony also demonstrated that additional services would not be able to repair the father's relationship with R.E.L.-G. in the foreseeable future. The court

found that "near future" for R.E.L.-G. was one to two months. The father does not challenge this finding, and it is a verity on appeal. Robel v. Roundup Corp., 148 Wn.2d 35, 42, 59 P.3d 611 (2002) (unchallenged findings are verities on appeal). Social worker Anna Culotti testified that she believed there was no likelihood R.E.L.-G. could be returned to her father within one to two months because the father had "not made progress and addressed [his] underlying parental deficiencies." Social worker Culotti also opined that the father "ha[d] not shown he can or will change his behavior" and that his "behaviors affect child safety." The GAL testified that she also did not believe the father could safely parent R.E.L.-G. in the near future, and expressed concern about the father's absenteeism, untruthfulness in his evaluations, his potential substance abuse, and his history of domestic violence.

Thus, the court's finding that services were futile is supported by clear and convincing evidence: further attachment services would cause R.E.L.-G. additional trauma and because the father was not in a position to benefit from them in the foreseeable future.

5. Services to Address Special Needs

The father claims that the Department failed to provide him all necessary services because it did not offer him services to address R.E.L.-G.'s special needs but did provide those services to R.E.L.-G.'s foster family. He asserts that R.E.L.-G.'s special needs—namely, her ADHD and PTSD—made it difficult for them to bond. But because the father does not adequately draw a connection

between lack of these services and termination, we conclude that these were not necessary services.

Foster parents have a fundamentally different relationship with a dependent child than noncustodial parents. K.M.M., 186 Wn.2d at 488. As such, noncustodial and foster parents are not required to receive "identical" services. K.M.M., 186 Wn.2d at 488. Rather, noncustodial parents are only required to receive all necessary services capable of correcting the parental deficiencies within the foreseeable future be offered or provided. RCW 13.34.180(1)(d). A service is "necessary" if it is " 'needed to address a condition that precludes reunification of the parent and child.' " K.M.M., 186 Wn.2d at 480 (quoting A.M.M., 182 Wn. App. at 793).

Here, R.E.L.-G.'s ADHD did not preclude reunification between R.E.L.-G. and her father; therefore, services addressing R.E.L.-G.'s ADHD were not necessary services capable of correcting the father's parental deficiencies. Though the father claims that R.E.L.-G.'s special needs "affected her ability to bond with her father during visits," he is mistaken. The father relies on testimony from Dr. Swing that as a child with ADHD, it would be "incredibly difficult" for R.E.L.-G. to stay engaged in virtual visits. But Dr. Swing's testimony is not definitive. Testimony supported that despite her diagnosis, R.E.L.-G. was typically "functioning well relationship-wise." And however true Dr. Swing's assertion may be, other testimony indicates that it was not R.E.L.-G.'s attention span that made the visits short—several witnesses testified that R.E.L.-G. did not trust her father and generally disliked him.

And while R.E.L.-G.'s PTSD may have made reunification more difficult, the father received attachment services necessary to address R.E.L.-G.'s PTSD symptoms and ameliorate his connection with R.E.L.-G. Dr. Solchany diagnosed R.E.L.-G. with PTSD and concluded that she "had a history of multiple traumas." Dr. Solchany opined that "trauma, especially relationship trauma, its needs to be healed within the context of healthy relationships," so a safe and trusting relationship must first be established. Dr. Swing testified that to better help the father cope with R.E.L.-G.'s PTSD, the father would need "more knowledge around children's developmental abilities and special needs" and that attachment services would help achieve that end. The father received relevant attachment and parenting services via Triple P.

Thus, services helping the father to address R.E.L.-G.'s ADHD were not necessary services and the father received necessary services to address R.E.L.-G.'s PTSD.

## Best Interests of the Child Standard

Both the mother and the father challenge the trial court's determination that termination was in R.E.L.-G's best interest. The mother characterizes the best interest determination as a conclusion of law reviewed de novo and claims that the conclusion was unsupported by the court's findings of fact. The father asserts that termination was not in R.E.L.-G.'s best interest because it would separate her from her culture and heritage. We reiterate that the best interest

20

determination is a factual finding and affirm the trial court's finding that termination was in R.E.L.-G.'s best interest as to both parents.

Once the State has proven the six statutory elements in RCW 13.34.180(1) by clear, cogent, and convincing evidence, the court must then determine whether termination is in the best interests of the child. RCW 13.34.180(1)(b); In re Dependency of A.M.F., 23 Wn. App. 2d 135, 147, 514 P.3d 755 (2022). "The burden of proof for this determination is a preponderance of the evidence." A.M.F., 23 Wn. App. 2d at 147. The trial court has broad discretion in making a best interest determination and "its decision receives great deference on review." In re Dependency of J.A.F., 168 Wn. App. 653, 670, 278 P.3d 673 (2012).

Determining the best interests of the child is largely dependent on the unique facts of the case and the circumstances of the child involved. In re Dependency of J.D.P., 17 Wn. App. 2d 744, 767, 487 P.3d 960 (2021) (citing In re A.V.D., 62 Wn. App. 562, 572, 815 P.2d 277 (1991)). "Courts therefore consider a broad range of nonexclusive factors." A.M.F., 23 Wn. App. 2d at 147. See, e.g., J.D.P., 17 Wn. App. 767-68 (considering parent's inability to rehabilitate over lengthy dependency period); M.R.H., 145 Wn. App. at 28 (considering children's bond with foster parents); J.A.F., 168 Wn. App. at 670-71 (considering father's substance abuse); K.R., 128 Wn.2d at 145-46 (considering housing stability and placement into a permanent home); In re Dependency of A.C., 123 Wn. App. 244, 254-55, 98 P.3d 89 (2004) (considering strength and nature of parent-child bond, benefit of continued contact).

1. As to the Mother

The mother asserts that the court's findings of fact do not support its conclusion that termination was in R.E.L.-G.'s best interest.[5] But contrary to the mother's assertion, the best interest determination is a factual finding, reviewed for substantial evidence, not a legal conclusion to be reviewed de novo. W.W.S., 14 Wn. App. 2d at 352 ("[T]he best-interests determination is an inherently factual one."); K.M.M., 186 Wn.2d at 477 (termination order reviewed for sufficiency of evidence).

Out of the court's many findings of fact, the mother only challenges one: that termination was in R.E.L.-G.'s best interest. The court's unchallenged findings are verities on appeal and support its best interest finding. Robel, 148 Wn.2d at 42. Indeed, at oral argument, counsel reiterated that the mother was not challenging any of the court's unfitness findings. Counsel instead argued that the best interest determination was not a "throwaway" factor; it must be supported by child-specific findings, such as a finding about the child's bond with the foster family. Counsel contended that unfitness findings alone are insufficient. While we agree that this is not a "throwaway" factor, we disagree that the record was insufficient to support a best interest determination.

Contrary to the mother's assertion, the court did make some child-specific findings. But more importantly, the totality of the circumstances supported a best

---

[5] The court made both a finding of fact and conclusion of law that termination was in R.E.L.-G.'s best interest. But we treat a finding of fact incorrectly denominated as a conclusion of law as a finding of fact. Willener v. Sweeting, 107 Wn.2d 388, 394, 730 P.2d 45 (1986).

interest determination. The court found that R.E.L.-G. was "in a stable, long-term placement with her foster family and she has made it clear that she wants to be adopted into this family." The court's other findings also supported a best interest determination. For example, the court found that the mother suffers from untreated mental health conditions that impact her ability to safely parent R.E.L.-G. It also found that the mother was offered a litany of services, none of which resulted in any long-term progress. The court noted that the mother did not agree that she suffered from any mental health conditions aside from agoraphobia and "completely disputed" her other diagnoses, which included "personality disorders, animal hoarding, and somatic symptom disorder." The mother denied her need for treatment for any of these issues. The court found the mother's denial "especially concerning . . . because these disorders, in particular animal hoarding, were specifically why [R.E.L.-G.] was in DCYF care." Moreover, the court found that it was unlikely the mother would address these deficiencies in the near future and that continuation of a parent-child relationship would diminish R.E.L.-G.'s prospects of integration into a permanent home. "Where a parent has been unable to rehabilitate over a lengthy dependency period, a court is 'fully justified' in finding termination in the child's best interests rather than 'leaving [the child] in the limbo of foster care for an indefinite period while [the parent] sought to rehabilitate himself." T.R., 108 Wn. App. 149, 167, 29 P.3d 1275 (2001) (alterations in original) (quoting In re Dependency of A.W., 53 Wn. App. 22, 33, 765 P.2d 307 (1988)).

These findings—unchallenged on appeal—constitute substantial evidence supporting the court's finding that termination was in R.E.L.-G.'s best interest.

2. As to the Father

The father contends that the Department did not prove the six RCW 13.34.180(1) factors by clear, cogent, and convincing evidence, and therefore, that the court could not reach the best interest prong of the termination analysis. Having already determined that the only challenged factor—whether all court ordered and necessary services were provided—was met, we are unpersuaded by this argument. The father then only challenges the court's best interest finding as it relates to R.E.L.-G.'s ability to maintain a connection to her culture. We conclude that substantial evidence supported the court's finding that termination was in R.E.L.-G.'s best interest.

The father states that termination is not in R.E.L.-G.'s best interest because only by maintaining a relationship with him can R.E.L.-G. maintain a connection to her culture. He relies heavily on Dr. Solchany's testimony to support this contention. But the father mischaracterizes much of Dr. Solchany's testimony. Contrary to his assertions, Dr. Solchany did not testify that an open adoption would be "ideal" nor that R.E.L.-G. "should" get to know her biological family members. Rather, she testified that "*if* dad was able to have something like an open adoption . . . that [R.E.L.-G.] *could* get to know her extended biologic family." (Emphases added.) And while Dr. Solchany did testify that R.E.L.-G. "knowing her culture and her heritage" was "very important," she stated that "especially with the Latino culture, there's a lot in the greater Seattle area.

24

There's lots of opportunities to connect with that." Dr. Solchany also testified that in addition to her father, R.E.L.-G.'s foster family could help her learn about and connect with her culture.

Other evidence also supported the court's best interest finding. The GAL testified that placing R.E.L.-G. with either of her parents would be "extremely traumatic" and would have a "big impact on her mental health and well-being." Dr. Solchany testified that R.E.L.-G. was securely attached and bonded to her foster family. And R.E.L.-G. testified that she wanted to remain with her foster family and that she did not want to live with her father because "he doesn't know how to take care of [her]." Dr. Solchany also testified that the impact on R.E.L.-G. if she were placed with her father would be "devastating" and would put her "at high risk of severe behavioral acting out." Dr. Solchany explained that because R.E.L.-G. is "very determined," she was at "high risk at actually making a plan or trying to hurt herself in some ways" if she was removed from her foster family. Substantial evidence supported the court's finding that termination was in R.E.L.-G.'s best interest.

<u>Challenges to Findings of Fact and Conclusions of Law</u>

The father assigns error to twelve findings of fact made by the court. Though he does not devote a distinct portion of his brief to any of these findings, many are addressed indirectly throughout his briefing. The challenged findings can be roughly grouped together by subject matter. Findings 2.16, 2.21, 2.22, 2.23, 2.25, 2.26, 2.27, 2.28, 2.29, and 2.30 concern the provision of services and

futility of providing additional services.  Finding 2.33 concerns whether the father is fit to parent R.E.L.-G.  Finding 2.34 concerns the best interests of the child.

To the extent these findings are discussed in the above sections on necessary services and best interests of the child, we conclude that they are supported by substantial evidence.  Those that are unaddressed, we decline to review.  See State v. Elliott, 114 Wn.2d 6, 15, 785 P.2d 440 (1990) ("This court will not consider claims insufficiently argued by the parties.").

### Evidence of Sibling Relationships

The mother claims that the court failed to make a finding as to R.E.L.-G.'s relationship with her siblings as required by RCW 13.34.200(3) and that this error necessitates reversal.  She urges this court to overturn In re Dependency of J.D.P., 17 Wn. App. 2d at 759, which determined that a violation of RCW 13.34.200(3) is not a basis for reversing a termination order.  The Department maintains that the court made three findings about R.E.L.-G.'s sibling relationships.  We disagree with the Department that those findings concerned R.E.L.-G.'s sibling relationships.  And while we decline to overrule J.D.P., we agree with the mother that the court erred in not making a finding as to R.E.L.-G.'s sibling relationships.

RCW 13.34.200(3) provides that "[a]n order terminating the parent-child relationship shall include a statement addressing the status of the child's sibling relationships and the nature and extent of sibling placement, contact, or visits."  Though the status of sibling relations is not a required element to support a

26

termination order, the court must include a statement concerning the status of sibling relationships. J.D.P., 17 Wn. App. 2d at 759.

The three findings the Department claims discuss R.E.L.-G.'s sibling relationships do not, in actuality, discuss R.E.L.-G.'s sibling relationships. Rather, each discusses the *father's* relationship with R.E.L.-G.'s sibling, O.K. The court heard sufficient testimony about R.E.L.-G.'s relationship with her siblings to enter a finding. We remand for entry of such findings.

<u>Scrivener's Errors</u>

The mother notes that the termination order contains two typographical errors: the order cites "RCW *3*.34.180(1)" instead of "RCW *13*.34.180(1)" in finding of fact 2.30 and then "RCW 13.*24*.180" instead of "RCW 13.*34*.180" in conclusion of law 3.4. She maintains that the proper remedy is remand to correct these scrivener's errors. Because we remand for the court to make a sibling relationship finding, we also direct the court to correct these scrivener's errors.

A scrivener's error is a clerical mistake that, "when amended, would correctly convey the intention of the court." State v. Davis, 160 Wn. App. 471, 478, 248 P.3d 121 (2011). A scrivener's error may be corrected at any time. Davis, 160 Wn. App. at 478. The remedy for a scrivener's error is remand to the trial court for correction. State v. Makekau, 194 Wn. App. 407, 421, 378 P.3d 577 (2016).

Here, the order contains two clerical errors and intended to reference "RCW 13.34.180(1)" and "RCW 13.34.180." Though the court's intention is

clear—and remand is only necessary as to the sibling relationship finding—the court should also correct these typos.

We affirm the termination order but remand for the court to enter a finding as to R.E.L.-G.'s sibling relationships and to fix the scrivener's errors.

_____
Smith, C.J.

WE CONCUR:

_____          _____
Coburn, J.                                       Hazelrigg, A.C.J.

28